STATE OF CONNECTICUT *v.* LIONEL BROWN
(14883)

BERDON, NORCOTT, KATZ, E. O'CONNELL and M. HENNESSEY, Js.

Argued December 2, 1994—decision released March 28, 1995*

---

* The state's motion for reargument en banc was granted May 8, 1995. This opinion has been superseded by *State* v. *Brown,* 235 Conn. 502, 668 A.2d 1288 (1995).

*Carolyn K. Longstreth*, assistant state's attorney, with whom were *Philip D'Eramo*, former assistant state's attorney, and, on the brief, *Eugene J. Callahan*, state's attorney, for the appellant-appellee (state).

*Lauren Weisfeld*, assistant public defender, for the appellee-appellant (defendant).

BERDON, J. The defendant, Lionel Brown, was convicted after a jury trial of, inter alia,[1] attempted larceny in the third degree in violation of General Statutes §§ 53a-49 (a) and 53a-124 (a) (2),[2] and forgery in the third degree in violation of General Statutes § 53a-140 (a).[3] The defendant appealed to the Appel-

[1] The defendant also was convicted of conspiracy to commit larceny in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-124 (a) (2), and criminal impersonation in violation of General Statutes § 53a-130 (a) (1). He has not contested these convictions.

[2] General Statutes § 53a-49 provides in pertinent part: "CRIMINAL ATTEMPT: SUFFICIENCY OF CONDUCT; RENUNCIATION AS DEFENSE. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-124 provides in pertinent part: "LARCENY IN THE THIRD DEGREE: CLASS D FELONY. (a) A person is guilty of larceny in the third degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds one thousand dollars . . . ."

General Statutes § 53a-119 provides in pertinent part: "LARCENY DEFINED. A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[3] General Statutes § 53a-140 provides: "FORGERY IN THE THIRD DEGREE: CLASS B MISDEMEANOR. (a) A person is guilty of forgery in the third degree

late Court, which reversed his convictions on these two counts and remanded the case to the trial court with direction to render the following judgments: As to the forgery count, the Appellate Court ordered the trial court to render a judgment of acquittal. As to the attempted larceny count, the Appellate Court ordered the trial court to render a judgment of guilty on the lesser included offense of attempted larceny in the fourth degree in violation of General Statutes §§ 53a-49 (a) and 53a-125 (a),[4] and to resentence the defendant accordingly. The Appellate Court also held that the trial court did not violate the defendant's constitutional rights when it failed to investigate a report of jury misconduct. *State* v. *Brown*, 33 Conn. App. 339, 635 A.2d 861 (1993).

The state and the defendant both petitioned this court for certification to appeal. We granted the state's petition for certification to appeal whether the Appellate Court had incorrectly concluded that (1) there was insufficient evidence to support the defendant's conviction on the forgery count, and (2) the dollar amounts that the defendant and his coconspirators attempted to steal could not be aggregated in order to support a conviction of attempted larceny in the third degree. We also granted the defendant's petition for certification to appeal whether the Appellate Court should have ordered the trial court to conduct a hearing on the report of jury misconduct.[5] We disagree with the state

when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument, or issues or possesses any written instrument which he knows to be forged.

"(b) Forgery in the third degree is a class B misdemeanor."

[4] General Statutes § 53a-125 (a) provides: "A person is guilty of larceny in the fourth degree when he commits larceny as defined in section 53a-119 and the value of the property or service exceeds five hundred dollars."

[5] We certified the following questions for review: (1) "Whether the Appellate Court properly reversed the defendant's conviction of forgery in the third degree on the ground of insufficient evidence?" and

on both of its certified issues, but agree with the defendant on his cross appeal.

The jury could reasonably have found the following facts. On May 8, 1991, at approximately 2:45 p.m., the defendant entered the Gateway Bank in Wilton. He identified himself to a bank teller as Clifford Sailer and attempted to make a split deposit[6] involving two checks. Both checks were made payable to and endorsed by "Clifford Sailer." The first check, which the defendant sought to deposit, was drawn on the account of Beth Anne Onderko in the amount of $728.90. The second check, which the defendant sought to cash, was drawn on the account of St. Pauls Inn of North Carolina in the amount of $960.

The teller, who was acquainted with the real Clifford Sailer, was suspicious of the defendant. She asked him for identification, but he could not produce any. The teller refused to complete the transactions, and the defendant left the bank, taking the checks with him. The teller then notified the bank manager of the incident.

A few moments later, a man identifying himself as Robert Black entered the bank and attempted to make a split deposit involving three checks, all of which were made payable to and endorsed by "Robert Black." The man sought to deposit the first two checks, which were in the amounts of $776.10 and $78. He wanted to cash

---

(2) "Whether the Appellate Court properly reduced the defendant's conviction of attempted larceny in the third degree to attempted larceny in the fourth degree on the ground that General Statutes § 53a-121 (b), which permits aggregation of the amounts of separate thefts when committed pursuant to a scheme, does not apply to attempts?" *State* v. *Brown,* 228 Conn. 926, 638 A.2d 40 (1994).

"Should the Appellate Court have directed the trial court to conduct a hearing into allegations of juror misconduct in the circumstances of this case?" *State* v. *Brown,* 228 Conn. 925, 638 A.2d 40 (1994).

[6] A split deposit is the simultaneous depositing of one or more checks and the cashing of another.

the third check in the amount of $880. When he could not produce any identification as requested, the bank manager refused to complete the transactions and the man left the bank. The bank manager then watched him as he joined the defendant and a woman in a waiting car. The bank manager noted the license plate number and called the Wilton police.

Shortly thereafter, a Wilton police officer stopped the car and arrested the three occupants. The woman, who was driving, carried identification in several names, along with $600 in cash. The man who previously had identified himself as Black carried $453. The defendant possessed a valid identification, $32, a deposit slip with Sailer's address written on it, a paper on which another name and address were written, and two checks totaling $1192 payable to Barbara Matison.

The police also seized a manila envelope from the car. Among the items in the envelope were various bank papers, checks, checkbooks, torn signature cards, customer receipts and change of name forms.

## I

We first consider the state's claim that the Appellate Court improperly concluded that there was insufficient evidence to support the defendant's conviction on the forgery count.

"[W]e have consistently employed a two-part analysis in appellate review of the sufficiency of the evidence to sustain a criminal conviction. *State* v. *Salz*, 226 Conn. 20, 31, 627 A.2d 862 (1993). First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. Id. That the evidence is cir-

cumstantial rather than direct does not diminish the probative force of that evidence. *State* v. *Carpenter*, 214 Conn. 77, 79, 570 A.2d 203 (1990), on appeal after remand, 220 Conn. 169, 595 A.2d 881 (1991), cert. denied, 502 U.S. 1034, 112 S. Ct. 877, 116 L. Ed. 2d 781 (1992)." (Internal quotation marks omitted.) *State* v. *DePastino*, 228 Conn. 552, 570, 638 A.2d 578 (1994). We must be mindful, however, that "[a]lthough the jury may draw reasonable, logical inferences from the facts proven, [it] may not resort to speculation and conjecture. *State* v. *Saracino*, 178 Conn. 416, 419, 423 A.2d 102 (1979). Each essential element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)." (Internal quotation marks omitted.) *State* v. *King*, 216 Conn. 585, 601, 583 A.2d 896 (1990), on appeal after remand, 218 Conn. 747, 591 A.2d 813 (1991).

In order to prove forgery in the third degree, the state was required to establish beyond a reasonable doubt that the defendant, while possessing an intent to defraud, deceive or injure another, had falsely made, completed or altered a written instrument, or had issued or possessed any written instrument which he knew to be forged. General Statutes § 53a-140; see footnote 3. As the Appellate Court noted, however, "the only evidence produced concerning the forgery of the checks was (1) the manila envelope and its contents, (2) the defendant's conduct, and (3) the bank teller's statement that the endorsements on the checks looked like [Sailer's] signature. There was no evidence that the endorsements were not that of [Sailer]." *State* v. *Brown*, supra, 33 Conn. App. 349. The Appellate Court, therefore, reversed the defendant's conviction on the forgery count. Id., 350.

The state argues that the Appellate Court improperly focused "exclusively on the authenticity of the

endorsement signature" and disregarded the other methods by which the state could have proved that the defendant had committed forgery. In particular, the state argues that the Appellate Court failed to recognize that "[a]s long as the defendant and/or his accomplices added to a blank check, without proper authorization, the name of the payee, the amount and the maker's signature, the checks were forged." The state contends that it presented "strong circumstantial evidence" of such unauthorized additions and that this evidence supported the jury's verdict of guilty. For example, the state argues that the defendant and his accomplices possessed blank checks drawn on the accounts of Onderko and St. Pauls Inn that matched the two checks the defendant had presented to the bank, that the blank Onderko checks included a carbon copy of the check the defendant had presented, and that the manila envelope found in the car with the defendant included blank checks from seven other accounts.

We find the state's argument to be lacking. The state failed to present any evidence whatsoever that the payee's name, the amount or the drawer's signature on either of the checks was not properly authorized. The state did not call Onderko or any representative of St. Pauls Inn, on whose accounts the allegedly improper checks were drawn, to testify that the checks were not genuine. The state did not call Sailer to testify that he had not personally endorsed the checks or that he had not authorized anyone to do so on his behalf. Moreover, although the state asserts in its brief to this court that some of the checks found in the car "appeared to have been completed in the same handwriting," the state failed to call an expert witness to compare the handwriting. Indeed, the only witness to testify about the appearance of the checks—the bank teller who dealt with the defendant—indicated that the signatures of Sailer appeared to be genuine.

It is fundamental to our system of justice that the state must prove each material element of a criminal offense beyond a reasonable doubt. *State* v. *Deleon*, 230 Conn. 351, 362, 645 A.2d 518 (1994). The state, having failed to present any evidence whatsoever of lack of authorization, cannot now contend that the defendant was properly convicted of forgery in the third degree. The judgment of the Appellate Court reversing the defendant's conviction of that crime, therefore, is affirmed.

II

The state next claims that the Appellate Court improperly concluded that, as a matter of law, the jury could not aggregate the amounts the defendant and his coconspirators attempted to steal in order to convict the defendant of attempted larceny in the third degree. We disagree with the state's contention and affirm the decision of the Appellate Court.

The key to a proper analysis of this question is the relationship between several different statutes. In this case, we must begin with the underlying crime of larceny. A person is guilty of committing larceny "when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ." General Statutes § 53a-119.

The grade of any larceny offense depends upon the value of the property taken. If the value of the property exceeds $500, for example, the crime constitutes fourth degree larceny. General Statutes § 53a-125. If the value of the property exceeds $1000, however, the crime is third degree larceny. General Statutes § 53a-124. In determining the value of the property taken and the grade of the offense, "[a]mounts included in thefts committed pursuant to one scheme or course

of conduct, whether from the same person or several persons, may be aggregated . . . ." General Statutes § 53a-121 (b).

The state contends that the defendant attempted to cash a check for $960 and that his coconspirator attempted to cash a check for $880. The sum of these two checks, $1840, is greater than the $1000 threshold necessary for a conviction of larceny in the third degree. The state argues, therefore, that the jury properly applied the statutes to return a guilty verdict against the defendant for attempted larceny in the third degree.[7]

As the Appellate Court properly recognized, however, the statute allowing for aggregation of property values, General Statutes § 53a-121 (b), is expressly limited "only to aggregation for thefts *committed*. There is no provision providing for aggregation for thefts *attempted*." (Emphasis in original.) *State* v. *Brown*, supra, 33 Conn. App. 352. The Appellate Court further recognized that criminal statutes must be construed narrowly; *State* v. *Crowell*, 228 Conn. 393, 399, 636 A.2d 804 (1994); and that courts must resolve doubts against the imposition of a harsher punishment. *State* v. *Hinton*, 227 Conn. 301, 317, 630 A.2d 593 (1993). The Appellate Court held, therefore, that the jury could not aggregate the value of the checks that the defendant and his coconspirator had attempted to steal.

In accordance with its analysis of these provisions, the Appellate Court held that the jury verdict against the defendant for attempted larceny in the third degree could not stand. Acknowledging, however, that the evi-

---

[7] A person is guilty of criminal attempt when, acting with the intent necessary to commit the crime, he "intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." General Statutes § 53a-49 (a) (2).

dence against the defendant was sufficient to support a finding that he personally had attempted to steal $960, the Appellate Court therefore reduced the charge of which the defendant had been convicted to the lesser included offense of attempted larceny in the fourth degree. See, e.g., *State* v. *Carpenter*, supra, 214 Conn. 85 (concluding that evidence was insufficient to support conviction for murder and reducing conviction to lesser included offense of manslaughter in the first degree).

The decision of the Appellate Court reflects a thoughtful and well reasoned analysis as well as a proper application of the law. We therefore affirm the judgment of that court on this issue.

### III

Finally, we consider the trial court's failure to hold a hearing on the possibility of jury misconduct in this case. The defendant argues that the Appellate Court should have ordered the trial court to conduct such a hearing. We agree.

The following additional facts are relevant to this issue. After the jury had returned its verdict but before the defendant was sentenced, the trial court received a letter from "a concerned citizen and a disenchanted friend."[8] The letter, which was otherwise unsigned, was

---

[8] The letter read as follows:

"Dear Judge Ripley;

I am writing this letter as a concerned citizen and a disenchanted friend. Myself and a group of friends were out for drinks this past week and somehow the conversation turned to the subject of a few of us being called for jury duty. My friend Dana starts telling us about a trial that she had been involved in. I believe the case involves a trial that was held in your court just recently. The case involve[d] a black man that was on trial for cashing bad checks. She was telling us that several times during the course of the trial the jury would be sent back into the jury room. She said a few times she could hear conversation from the court room. One day she heard one of the sheriffs telling another that he saw a Wilton detective showing some

addressed to Judge Ripley, who had presided over the case. The letter addressed concerns the author had about "a trial that was held in your court just recently" and said the case involved an African-American who had been charged with "cashing bad checks." The author stated that a friend named Dana had been on the jury and that Dana had said that, at certain times while the jurors were sequestered in the jury room, Dana could overhear deputy sheriffs talking in the courtroom. On one occasion, according to the letter, Dana heard a deputy recount how a Wilton detective had shown photographs to one of the witnesses "because the witness couldn't remember what the guy looked like." According to the letter, Dana also overheard the deputies discussing a "betting pool," and "they were betting that the defendant would be found guilty because he was black and from New York."

Judge Ripley, after receiving the letter, gave it to the chief sheriff and instructed the sheriff to deliver it to the office of the state's attorney. Judge Ripley failed to instruct the sheriff to forward a copy to the defendant's attorney. The defendant's attorney, in fact, only learned of the existence of the letter and its content when he arrived in court the following day for a

---

pictures to one of the witnesses because the witness couldn't remember what the guy looked like. I don't know what the legal term for something like this is called, but it is improper to allow that to happen. She also told us about a betting pool that the sheriffs had going, they were betting that the defendant would be found guilty because he was black and from New York. Several years ago my brother was found guilty in [a] criminal case because the jury had been allowed to hear things that prejudiced them against him. I didn't think things like this were that common place. But I was wrong.

I have thought about this for several days now and have decided that I should [send] copies of this letter to the Norwalk Hour, Chief Prosecuting Attorney, and to the defendant's Attorney, Mr. Steven Weinstein."

The defendant's attorney at the time of trial, Stephen Feinstein, whose name was spelled differently than the author of the letter believed, indicated that he had not received a copy of the letter.

hearing on his motions for a judgment of acquittal or a new trial and for the sentencing of his client. The defendant's attorney asked the trial court to make the letter a part of the record, and the court agreed. The attorney then incorporated the allegations of the anonymous letter into his motions for a judgment of acquittal or a new trial. The trial court, however, denied both motions and sentenced the defendant to a term of imprisonment.[9] At no time during this hearing did the defendant's attorney request the trial court to conduct an investigatory hearing to determine whether possible juror misconduct had occurred.

On appeal, however, the defendant urged the Appellate Court to order the trial court to conduct such a hearing, arguing that the trial court's failure to investigate sua sponte the possibility of jury misconduct had violated the defendant's state and federal constitutional rights. The majority of the court, however, refused to order such an investigatory hearing, reasoning that the letter itself had set forth with sufficient specificity the allegations of misconduct and that, even if true, these allegations did not amount to a violation of the defendant's constitutional rights. *State* v. *Brown*, supra, 33 Conn. App. 345–46. Judge Lavery of the Appellate Court dissented, arguing that precedent in this state requires the trial court, sua sponte, "to conduct some minimal investigation where it appears that the jury may have been exposed to prejudicial extrinsic evidence." Id., 356.

On appeal to this court, the defendant argues that the trial court's failure to hold an evidentiary hearing to investigate the report of jury misconduct deprived

---

[9] For each charge of third degree larceny and conspiracy to commit third degree larceny, the defendant received a four year sentence, to be suspended after two years, with probation for three years; for criminal impersonation and for third degree forgery, the defendant received a six month sentence on each. All of the sentences were to run concurrently.

him of several rights protected by article first of the Connecticut constitution, including his right to due process of law; Conn. Const., art. I, § 8;[10] his right to trial by jury; Conn. Const., art. I, § 19;[11] and his right to equal protection of the laws. Conn. Const., art. I, § 20.[12] He also argues that the trial court's actions deprived him of his rights to due process, equal protection and an impartial jury as guaranteed by the fifth, sixth and fourteenth amendments to the United States constitution. We agree with the defendant that our state constitution requires a trial court in such circumstances to conduct a hearing into allegations of jury misconduct.[13]

---

[10] Article first, § 8, of the constitution of Connecticut, as amended by article XVII of the amendments, provides in pertinent part: "No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

[11] Article first, § 19, of the constitution of Connecticut, as amended by article IV of the amendments, provides, in pertinent part: "The right of trial by jury shall remain inviolate . . . ."

[12] Article first, § 20, of the constitution of Connecticut, as amended by articles V and XXI of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

[13] The state contends that the defendant has failed properly to preserve this claim and, therefore, is barred from seeking appellate review of the trial court's decision. The state claims (a) that "any claims arising out of the anonymous letter should have been raised by a petition for [a] new trial under Practice Book § 904 instead of a motion for a new trial under Practice Book § 902," and (b) that our decision in *State* v. *Sauris*, 227 Conn. 389, 631 A.2d 238 (1993), prevents us from ordering the trial court to conduct a hearing if the defendant failed to request one. We disagree with both contentions.

First, while it may, in fact, be true that if the defendant were requesting a new trial he needed to have done so by invoking the provisions of § 904, the defendant is not requesting that form of relief. Instead, the defendant merely is requesting an evidentiary hearing before the trial court. Thus, the Practice Book sections cited by the state are inapposite.

Second, the state misapprehends both the factual setting of *Sauris* and our holding in that case. In *Sauris*, the defendant claimed error in the trial court's refusal to grant his motion for a judgment of acquittal. We explained

The facts of this case and the defendant's arguments implicate two closely interrelated components of constitutional analysis regarding a criminal defendant's right to an impartial jury. The first component involves the criminal defendant's right to have his case decided by a jury that is unprejudiced by events and occurrences extrinsic to the court proceeding. The second component, which revolves around the first, involves the scope of the trial court's duty, when possible jury misconduct is brought to its attention, to determine whether the accused's constitutional right to a jury trial has been prejudiced, even if counsel for the accused fails to request such an investigatory hearing. We shall address each of these seriatim.

## A

As to the first component, it is well established that a criminal defendant has a fundamental right under *both* the federal and state constitutions to have a jury decide his fate based only upon evidence introduced at trial. As Justice Holmes noted, "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson* v. *Colorado*, 205

that in such a case, "the appellant bears the burden of furnishing a record adequate to review a claimed error." Id., 403. Noting that the defendant had failed to request a voir dire of the individual jurors or request an evidentiary hearing into the allegations of juror misconduct, we held that we could not review his claim of error. Here, however, the defendant is not seeking a reversal of his conviction at this stage, but merely an evidentiary hearing into the allegations of misconduct, and he argues that the trial court was required to order such a hearing sua sponte. In fact, the defendant is seeking the very type of hearing on appeal that the defendant in *Sauris* failed to request at any time. Our holding in *Sauris*, therefore, does not prevent us from ordering the trial court to conduct such a hearing. Finally, the defendant in *Sauris* never claimed that the trial court's failure to conduct, sua sponte, an investigatory hearing had violated the defendant's state or federal constitutional rights, and that issue, therefore, was not before us on appeal.

U.S. 454, 462, 27 S. Ct. 556, 51 L. Ed. 879 (1907). Indeed, "[t]he modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given them in the adversary arena after proper instructions on the law by the court. See *Turner* v. *Louisiana,* 379 U.S. 466, 472–73, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965); *Patterson* v. *Colorado,* [supra, 462]." *State* v. *Rodriguez,* 210 Conn. 315, 325, 554 A.2d 1080 (1989). This constitutional requirement is essential in order to preserve the "full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner* v. *Louisiana,* supra, 472–73. Furthermore, when we refer to the rubric of jury misconduct with respect to the jury's exposure to extrinsic material, we include both the jury's intentional and inadvertent exposure to such material. The constitutional right to a trial by an impartial jury is concerned with *whether* the jury was exposed to extrinsic material, not *how* the exposure occurred. Indeed, the manner in which the jury was exposed to extrinsic material is not relevant. "Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. U.S. Const., amend. XIV; Conn. Const., art. I, § 8 . . . ." (Internal quotation marks omitted.) *State* v. *Brigandi,* 186 Conn. 521, 542–43, 442 A.2d 927 (1982). "Consideration [by the jury] of extrinsic evidence is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury." *State* v. *Asherman,* 193 Conn. 695, 736, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

These cases make clear that if the jurors in this case were prejudiced by something they may have heard while they waited in the jury room, their verdict cannot stand. The defendant's attorney, however, did not ask

the court to conduct an evidentiary hearing to determine whether the allegations contained in the anonymous letter were true or whether there may have been other instances of jury misconduct that the letter's author did not detail. The question in this case, therefore, is whether the trial judge has a duty independent of a request by the parties to investigate allegations of jury misconduct.

## B

The contours of the second component involved in this case—the scope of the trial court's independent duty to assure that jurors are unprejudiced throughout the proceedings—are somewhat less well defined. Although the United States Supreme Court has expressed approval for a trial court's decision to hold a hearing on jury misconduct in response to a motion by one of the parties; see, e.g., *Smith* v. *Phillips*, 455 U.S. 209, 216–17, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); *Remmer* v. *United States*, 347 U.S. 227, 230, 74 S. Ct. 450, 98 L. Ed. 654 (1954); that court apparently has not considered whether the United States constitution requires a court to order such a hearing sua sponte. Moreover, although the defendant cites a decision of the First Circuit Court of Appeals as imposing such a requirement; see *United States* v. *Anello*, 765 F.2d 253, 259 (1st Cir. 1985), cert. denied sub nom. *Wendolkowski* v. *United States*, 474 U.S. 996, 106 S. Ct. 411, 88 L. Ed. 2d 361 (1985); we do not read *Anello* as standing for this proposition.[14] Finally, other federal courts have

---

[14] Indeed, to the extent that *Anello* is applicable at all, that case seems to undermine, rather than bolster, the defendant's argument. In *Anello*, the court learned during in camera interviews with each juror that one alternate juror had seen one regular juror "using a calculator, apparently to determine how much money defendants might make from their drug transactions. The court dismissed both jurors, but it did not ask the other jurors about the incident." *United States* v. *Anello*, supra, 765 F.2d 258–59. The First Circuit Court of Appeals held that the trial court had not abused its discretion in failing to conduct a more thorough investigation. Id., 259.

stated that the trial court has no obligation to conduct an investigation if counsel for neither party has requested it. See, e.g., *United States* v. *Bailey*, 952 F.2d 363, 366 (10th Cir. 1991); *United States* v. *Cyphers*, 553 F.2d 1064, 1071 (7th Cir.), cert. denied, 434 U.S. 843, 98 S. Ct. 142, 54 L. Ed. 2d 107 (1977). Nevertheless, we need not speculate how the United States Supreme Court would rule on the issue because the defendant in this case also invokes the Connecticut constitution. Accordingly, we decide this issue on state constitutional grounds and need not reach the defendant's federal constitutional claim. See *State* v. *Joyce*, 229 Conn. 10, 15–16 n.6, 639 A.2d 1007 (1994).

This court and the Appellate Court have held that article first, § 8, of our state constitution imposes certain special responsibilities on a trial judge who presides over a criminal case. The reason is simple. "In a criminal trial, the judge is more than a mere moderator of the proceedings. It is his responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. *State* v. *Echols*, 170 Conn. 11, 13, 364 A.2d 225 (1975)." (Internal quotation marks omitted.) *State* v. *Brigandi*, supra, 186 Conn. 543. In keeping with this jurisprudence, this court has held, for example, that a trial judge violates a defendant's constitutional right to an unprejudiced jury when it instructs jurors that they may discuss the case among themselves before the case is submitted for deliberations. *State* v. *Washington*, 182 Conn. 419, 429, 438 A.2d 1144 (1980). The Appellate Court, moreover, has held that our state constitution imposes an affirmative obligation on a trial judge who learns that a juror may have been exposed, outside of the adversarial arena, to information that may have some tendency to affect the juror's deliberations. In *State* v. *Gonzalez*, 25 Conn. App. 433, 439–40, 596 A.2d 443

(1991), aff'd on other grounds, 222 Conn. 718, 609 A.2d 1003 (1992), the Appellate Court held that, "[i]n order to determine whether the defendant has been deprived of his right to an impartial jury, the trial court must first determine what, if anything, was said, and if necessary, how the jury interpreted and reacted to the communication made." Furthermore, in *State* v. *Harris*, 32 Conn. App. 831, 836, 632 A.2d 50, appeal dismissed, 230 Conn. 347, 644 A.2d 911 (1994), the Appellate Court stated that "[t]he trial court must conduct a hearing to determine whether jury misconduct occurred. . . . The hearing allows the trial court to assess the credibility of witnesses and the weight to be accorded their testimony. . . . Once the trial court finds that consideration of extrinsic evidence occurred, the court must then determine whether the misconduct actually prejudiced the defendant." (Citations omitted.) See also *State* v. *Jaynes*, 35 Conn. App. 541, 562, 645 A.2d 1060, cert. denied, 231 Conn. 928, 648 A.2d 880 (1994).

The writings of the earliest legal scholars in this state, as well as our earliest case law, confirm that this approach is the proper one under our common law. Chief Justice Zephaniah Swift, writing in 1822, detailed the obligations of the parties and the trial judge when reports of jury misconduct arise: "In motions to set aside the verdict for misbehaviour of the jurors or the parties, the facts which are the ground of the motion, must be specially stated; and the opposite party may deny or demur to them: *when the facts are contested, the court must ascertain their truth, by the testimony of witnesses*; and where they find them true, if they are insufficient, the verdict will not be set aside." (Emphasis added.) 1 Z. Swift, A Digest of the Laws of the State of Connecticut (1822) p. 776. Indeed, the earliest cases of our Supreme Court indicate that a trial judge, when faced with allegations of jury misconduct, must undertake a fact-finding inquiry in order to determine the

veracity of allegations of jury misconduct. See, e.g., *Pettibone* v. *Phelps*, 13 Conn. 445, 451–52 (1840) ("[i]n this case, the court has found, that the juror, while the cause was on trial, said to one of the plaintiffs' witnesses, that the trial had been lengthy, and the cause protracted"); *Bennett* v. *Howard*, 3 Day (Conn.) 219, 223 (1808) ("[i]n this case, the court below found, that one of the jurors conversed freely with persons not of the jury, about the case, while it was on trial").

Furthermore, our more recent decisions, although not specifically referencing the Connecticut constitution, support this view. In *State* v. *Savage*, 161 Conn. 445, 450, 290 A.2d 221 (1971), we held that "[u]nless the facts as to outside contact with a juror conclusively show prejudice, the trial court is not bound to declare a mistrial. Rather, *the proper procedure is for the court to conduct a hearing, formal or informal as the occasion may demand, in the presence of a court reporter, at which the facts can be established.*" (Emphasis added.) Similarly, in *State* v. *Castonguay*, 194 Conn. 416, 436, 481 A.2d 56 (1984), we noted that although the trial court had improperly instructed the jury that it could discuss the case before entering formal deliberations, "we certainly will not accept the defendant's speculation that the jurors did in fact discuss the evidence and evaluate it." Instead, we remanded the case for an evidentiary hearing so that the trial court could determine whether the jurors had, in fact, done so.

Finally, we have held that certain rights of constitutional magnitude are so fundamental that the trial court commits reversible error when it fails to ask, independent of any motion or request by the parties, whether the defendant has knowingly and voluntarily waived the right. Such rights include the right to represent oneself; *State* v. *Frye*, 224 Conn. 253, 262, 617 A.2d 1382 (1992); the right to have a trial by jury; *State* v. *Williams*, 205 Conn. 456, 461, 534 A.2d 230 (1987); and

the right to be represented by an attorney who does not have a conflict with the defendant. *State* v. *Williams*, 203 Conn. 159, 166–67, 523 A.2d 1284 (1987). Surely, the right of a defendant to be tried by fair and impartial jurors who have not committed misconduct is a right of the same magnitude and, therefore, requires the trial court, when put on notice of possible jury misconduct, independently to assure that the judicial process has not been impermissibly tainted.

We conclude that due process of law under article first, § 8, of our Connecticut constitution requires the trial court to ensure that a jury remains impartial and unprejudiced throughout the trial. When a judge is alerted to the possibility that a juror may have been exposed, outside of the adversarial arena, to information that may tend to affect his or her deliberations, the judge has an independent obligation to investigate by conducting an evidentiary hearing into the allegations. Only in this manner may the court determine whether a juror has been exposed to prejudicial extrinsic evidence and, as a result, whether the defendant's fundamental right to an impartial jury under our state constitution has been protected. Indeed, the judge's constitutional obligation to ensure that justice is done is not discharged merely because the defendant has failed to request such a hearing. The trial judge, after all, "is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome." *State* v. *Bausman*, 162 Conn. 308, 312, 294 A.2d 312 (1972).[15]

The nature and scope of this hearing, of course, will depend on the nature of the allegations of juror misconduct. "There is no magic formula that the trial court

---

[15] Although we hold that the trial court has an obligation, sua sponte, to conduct some sort of an investigatory hearing when it learns of possible juror misconduct, it remains appropriate for either the state or the defendant to initiate such a proceeding by moving to this effect as soon as possible.

must follow in conducting this inquiry. Rather, it must use whatever inquisitorial tools are necessary and appropriate to determine whether there was a 'reasonable possibility' of prejudice." *United States* v. *Savage*, 701 F.2d 867, 871 (11th Cir. 1983). The only limitation upon the court is that, in taking whatever investigatory actions it deems appropriate, it does so with counsel for both parties present and with an opportunity to participate in the proceedings. See *Remmer* v. *United States*, supra, 347 U.S. 229–30. These proceedings, of course, must be recorded by the court reporter. *State* v. *Savage*, supra, 161 Conn. 450.

A trial court not only has wide discretion in deciding how to pursue the initial inquiry, but also in determining "the nature and effect of information that comes to a juror improperly as well as its potential effect upon the jury if it learns of it. See generally *Marshall* v. *United States*, 360 U.S. 310, 312, 79 S. Ct. 1171, 3 L. Ed. 2d 1250 (1959); *Remmer* v. *United States*, supra, [347 U.S.] 229–30; *United States* v. *Hillard*, [701 F.2d 1052, 1064 (2d Cir.), cert. denied, 461 U.S. 958, 103 S. Ct. 2431, 77 L. Ed. 2d 1318 (1983)]." *State* v. *Rodriguez*, supra, 210 Conn. 326. Similarly, in cases where the court determines that the defendant has been prejudiced, the court is vested with discretion to grant the defendant's motion for a mistrial or, if the verdict has already been rendered, to grant a motion to set aside the verdict. See id., 326–27.

It is clear that the trial court in this case should have conducted a hearing to investigate the possibility of jury misconduct once it received the letter. Although the letter was anonymous, it was addressed to Judge Ripley, who had presided over the case, and referred to the trial of an African-American who had been charged with "cashing bad checks." The author said a friend named Dana had been a member of the jury, and, in fact, a woman named Dana L. Clarke had been

a juror on the defendant's case. The author referred
to Dana's statements that the jury, while waiting in
the jury room, had heard the sheriffs discussing the case
and the likelihood that the defendant would be con-
victed. All of these factors, which pointed unavoida-
bly to this case and to the possibility that the jurors
had been exposed to extrinsic information that may
have influenced their deliberations, required the judge
to investigate by conducting a hearing on the allega-
tions.

We disagree with the Appellate Court's refusal to
order a hearing on the grounds that "the note itself
set forth with specificity what the author alleged to be
the misconduct" and that the court "had a sufficient
factual basis on which to determine whether jury mis-
conduct had occurred . . . ." *State* v. *Brown*, supra,
33 Conn. App. 345–46. We reach a contrary conclusion
for several reasons. First, and most importantly, the
letter indicated that the jury, or at least one of the
jurors, may have been exposed to racist remarks and
attitudes expressed by deputy sheriffs, who are state
employees and under the control of the court. Such
exposure strikes at the heart of the right to a trial by
an impartial jury and the right to equal protection. The
alleged wagers by deputy sheriffs that the defendant
would be convicted merely because of the color of his
skin—wagers made within the halls of justice—singled
out the defendant on the basis of race and suggested
that the outcome of his trial would hinge on this ground.
Such a suggestion is intolerable. Indeed, Justice Nor-
cott, then a judge on our Appellate Court, made this
very point in regard to jury selection. His words, how-
ever, have equal application to a case wherein the jury
is exposed to racist remarks made by court personnel:
"[I]t is important that our courts attempt to fashion
remedies that both vindicate the accused's constitu-
tional rights to an impartial jury and protect the pub-

lic's interest in the integrity of the jury selection system, the very bedrock of our truth seeking process. . . . [T]he avoidance of judicial oversight may have been acceptable in times when women, blacks and other minorities were unwelcome within the corridors of the legal system, but they are no longer valid in the pluralistic, race conscious society we inhabit today. . . . Racial bias in jury selection, this courtroom vestige of slavery; D. Colbert, ['Challenging the Challenge: Thirteenth Amendment as a Prohibition Against the Racial Use of Peremptory Challenges,' 76 Cornell L. Rev. 1, 6 (1990)]; not only thwarts the exercise of that right, but violates our Constitution and the laws enacted under it [and] is at war with our basic concepts of a democratic society and a representative government. *Smith* v. *Texas*, 311 U.S. 128, 130, 61 S. Ct. 164, 85 L. Ed. 84 (1940). [I]n such a war the courts cannot be pacifists. *People* v. *Wheeler*, [22 Cal. 3d 258, 267, 583 P.2d 748, 148 Cal. Rptr. 890 (1978)]." (Internal quotation marks omitted.) *State* v. *Jones*, 29 Conn. App. 304, 357–59, 615 A.2d 149 (1992) (*Norcott, J.*, concurring and dissenting).

Second, the very fact that the author of the letter was not a juror, but was instead merely communicating to the court what a friend had said, should have led the court to investigate the allegations. It is quite possible that the author did not personally know about everything the jury may have heard, or that the author had failed to include in the letter certain instances of more prejudicial communications to the jury. As Judge Lavery wrote in his dissent in the Appellate Court, "[t]he letter created the appearance that the jury may have been prejudicially exposed. Therefore, the trial court was required to make some basic factual inquiry about possible misconduct." *State* v. *Brown*, supra, 33 Conn. App. 359. Accordingly, the Appellate Court

should have ordered the trial court to conduct an evidentiary hearing on the allegations of jury misconduct contained in the anonymous letter.

We affirm the judgment of the Appellate Court with respect to the first two issues; we reverse the judgment of the Appellate Court with respect to the third issue, and remand the case to that court with direction to remand the case to the trial court for an investigatory hearing.

In this opinion the other justices concurred.