STATE OF CONNECTICUT *v.* EDWARD G. WEARING
(AC 15214)

O'Connell, C. J., and Hennessy and Shea, Js.

Argued March 4—officially released September 23, 1997

*Lawrence R. Pellett*, special public defender, for the appellant (defendant).

*Lisa Herskowitz*, deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David J. Strollo*, assistant state's attorney, for the appellee (state).

*Opinion*

SHEA, J. The defendant, Edward G. Wearing, has appealed from the judgments rendered on a jury verdict finding him guilty of kidnapping in the second degree with a firearm in violation of General Statutes § 53a-94a, sexual assault in the third degree in violation of General Statutes § 53a-72a, assault in the second degree in violation of General Statutes § 53a-60, and tampering with a witness in violation of General Statutes § 53a-151.

On appeal, the defendant claims (1) that his constitutional right to a fair trial by an impartial jury was violated by the failure of the trial court to conduct a proper investigation and to declare a mistrial when a juror placed a cartoon, which the defendant maintains was racially offensive, on a table in the jury room where some other jurors saw it, (2) that the admission into evidence of a tape-recorded statement of the victim violated the hearsay rule and was prejudicial, and (3) that the exclusion of the testimony of a witness offered by the defendant to prove that the victim had made statements inconsistent with her testimony at trial was contrary to the rule of evidence allowing such testimony for the purpose of impeachment. We reject the first two claims, but agree with the defendant that the exclusion of the evidence of prior inconsistent statements was improper. We affirm the judgments, nevertheless, because the ruling on evidence had no significant impact on any of the findings of guilt.

From the evidence supporting the verdict, the jury could reasonably have found that on the morning of February 21, 1994, the victim telephoned the defendant and accused him of molesting their four year old son. The defendant became very upset. That evening, about 7:30 p.m., the defendant drove to the victim's home and confronted her. During the argument that ensued, the defendant struck the victim on the head with a beer bottle. When she fell to the ground, he grabbed her hair and pulled her until she stood up. Holding her by the hair, he led her to his truck and pushed her inside. The victim called for help as the defendant walked toward the truck. The defendant threatened to shoot some people who approached to offer help.

The defendant drove with the victim to his mother's house in Hamden, where he was living. Despite the victim's objections, he made her get out of the truck and enter the house, from which his mother and stepfather were then absent. He forced her downstairs to the basement, in which he had a bedroom. He told the victim to remove her clothes. While protesting, she did so because of his threat to kill her. She testified that the defendant forced her onto his bed, where he had sexual intercourse with her.

By the time the defendant's mother and stepfather arrived at the house, approximately 9 p.m., both the defendant and the victim were upstairs in the kitchen. His mother got into an argument with the defendant, and he left the house. The victim told the defendant's mother that the defendant had struck her, forced her to come to the house and raped her. She said she did not feel well and wanted to go home. The defendant's mother and stepfather took the victim to her home in their car.

The police were waiting at the victim's home with a neighbor who had called them after she had observed

the victim being forced into the defendant's truck. The victim told the police what had happened to her and requested that she be taken to a hospital. The police first took her to the New Haven police station, where she gave a tape-recorded statement to a detective. The police then drove her to a hospital, where she was examined and given medication.

The witness tampering charge alleges that on March 5, 1994, the defendant telephoned the victim at approximately 3 a.m. and attempted to induce her to testify falsely, to withhold testimony, to elude legal process summoning her to testify or to absent herself from any official proceeding. The victim testified that the defendant had made a telephone call to her home at that time and threatened to kill her if she did not drop the charges. She called her brother-in-law, who took her and her children to his home. She also reported the incident to the police and gave them a tape-recorded statement.

I

## JUROR MISCONDUCT

During the luncheon recess that followed completion of the state's initial closing argument, trial counsel for the defendant entered the jury room after the departure of the jurors to use the bathroom facilities. He discovered a cartoon attached to the bulletin board in the room that showed two black jurors sitting at opposite ends of an otherwise empty jury box, one of whom is pointing at the other and saying to Judge Ito, the presiding judge at the O. J. Simpson criminal trial, "Your Honor, he's looking at me!"

When the court reconvened, the defendant moved for a mistrial on the ground that the jurors had been exposed to a cartoon that was racially offensive and prejudicial. The state argued that the cartoon was

merely a humorous comment on the exodus of jurors from the Simpson trial and that any prejudice could be cured by an appropriate instruction of the court. The court denied the motion for a mistrial and, when the jurors returned to the courtroom, they were told to strike the cartoon from their minds. After completion of the remaining arguments and the charge to the jury, the jurors deliberated and reached their verdict on the various charges the next day.

Five days after the verdict, the court, sua sponte, conducted a hearing in regard to the cartoon. The court indicated that, out of "an abundance of caution," it had concluded that such a hearing was required by *State* v. *Brown*, 232 Conn. 431, 656 A.2d 997 (1995) (*Brown I*), which had been published on March 28, 1995, approximately three months before the hearing. The court informed counsel that it would question each of the six jurors who had participated in rendering the verdict about the cartoon, but would not permit questioning by the attorneys. Defense counsel objected to being precluded from questioning the jurors.

At the hearing, the foreman of the jury testified that he had seen the cartoon in a newspaper he was reading in the jury room. He tore it out and placed it on the table in the jury room. A couple of people looked at it and laughed. He said there was no discussion of the cartoon and that it had no bearing on the jury deliberations. Another juror said that she had not seen the cartoon and that it was not discussed during deliberations. Others said that they had seen the cartoon but had not read it or paid much attention to it. All the jurors testified that the cartoon was not discussed during deliberations and had not entered into their deliberations. The court, after questioning the jurors, declared that it was satisfied that the cartoon had "played no part prejudicial to the defendant in connection with the jury's deliberations in the case."

In *Brown I*, our Supreme Court concluded that the due process clause of article first, § 8, of our state constitution requires that, "[w]hen a judge is alerted to the possibility that a juror may have been exposed, outside of the adversarial arena, to information that may tend to affect his or her deliberations, the judge has an independent obligation to investigate by conducting an evidentiary hearing into the allegations. Only in this manner may the court determine whether a juror has been exposed to prejudicial extrinsic evidence and, as a result, whether the defendant's fundamental right to an impartial jury under our state constitution has been protected. . . . The nature and scope of this hearing, of course, will depend on the nature of the allegations of juror misconduct. . . . The only limitation upon the court is that, in taking whatever investigatory actions it deems appropriate, it does so with counsel for both parties present and *with an opportunity to participate in the proceedings*." (Citations omitted; emphasis added; internal quotation marks omitted.) *Brown I*, supra, 232 Conn. 451–52.[1] In this appeal, the defendant claims that the trial court's pronouncement at the start of the hearing, that questioning of the jurors by counsel would not be permitted, was contrary to *Brown I* and that his motions for a mistrial and for a new trial should have been granted.

Following the decision in *Brown I*, the state filed a motion for reargument and reconsideration of the case en banc, which was granted. *State* v. *Brown*, 235 Conn. 502, 506, 668 A.2d 1288 (1995) (*Brown II*). The opinion of the en banc court in *Brown II* invoked the supervisory powers of the court rather than our state constitution, on which *Brown I* had relied, in concluding that

---

[1] The rescript in *Brown I* ordered that the case be remanded to the trial court for an investigatory hearing on allegations contained in an anonymous letter to the presiding judge that some jurors may have overheard conversations among the deputy sheriffs attending the trial that were possibly prejudicial. *Brown I*, supra, 232 Conn. 455.

the case should be remanded "to the trial court for further proceedings regarding the issue of jury misconduct consistent with this opinion." Id., 532. "Exercising our inherent supervisory power over the administration of justice, we now hold that henceforth a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel. Although the form and scope of such an inquiry lie within a trial court's discretion, the court must conduct some type of inquiry in response to allegations of jury misconduct. That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between. Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto." Id., 526

The defendant claims that, because his trial was completed before *Brown II* was decided, the applicable precedent is the statement in *Brown I* requiring that "[w]hen a judge is alerted to the possibility that a juror may have been exposed, outside the adversarial arena, to information that may tend to affect his or her deliberations, the judge has an independent obligation to investigate by conducting an evidentiary hearing"; *Brown I*, supra, 232 Conn. 451; in the presence of counsel for both parties "and with an opportunity to participate in the proceedings." Id., 452.

We conclude, however, that *Brown II* is the controlling precedent, although that opinion was not released until after the trial of the present case. When the state's motion for reargument was filed, it necessarily post-

poned the efficacy of *Brown I* until the motion was acted on and, once it was granted, until the release of the opinion in *Brown II.* "[A]ll proceedings to enforce or carry out the decision of the court having appellate jurisdiction shall be stayed until the time for filing a motion for reargument has expired, and, if a motion is filed, until its disposition, and, if it is granted, until the appeal is finally determined." Practice Book § 4123. In *Brown II*, the majority opinion chides the dissenters for relying on language from *Brown I*: "[W]e reject the proposition that the earlier opinion has continuing validity. Our decision today supersedes our earlier opinion in its entirety." *Brown II*, supra, 235 Conn. 506 n.5. In the federal courts, "reconsideration in banc vacates the panel opinion, and the previous panel opinion no longer has any standing except to the extent that the in banc court adopts it. . . . [T]he court sitting in banc is technically reviewing the judgment of the lower court, and not the panel decision, which has, in effect, been vacated . . . ." 5 Am. Jur. 2d, Appellate Review § 908 (1995). Vacation of the judgment "generally deprives such judgment . . . of any effect, including precedential effect." Id., § 846.

The defendant also claims that the trial court failed to satisfy even the less rigid criteria of *Brown II* for investigating possible jury misconduct of which the court becomes aware. Those criteria, however, were not intended to apply retroactively to cases like this one that had been tried to a conclusion prior to release of that opinion. The requirement that a trial court "conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case" is preceded by the phrase, "we now hold that henceforth." *Brown II*, supra, 235 Conn. 526.

Before the advent of *Brown I* and *Brown II*, our Supreme Court had "recognized that the trial court has

broad discretion to determine the form and scope of the proper response to allegations of jury misconduct." *Brown II*, supra, 235 Conn. 523–24. The Supreme Court had "limited [its] role, on appeal, to a consideration of whether the trial court's review of alleged jury misconduct can fairly be characterized as an abuse of its discretion." Id., 524. In this case, it was the defendant's counsel who discovered the cartoon that is the sole basis for the claim of jury misconduct and called it to the attention of the court by moving for a mistrial. He argued that the cartoon was offensive because it singled out two of the black jurors in the Simpson case. He never explained to the trial court why the cartoon would likely have prejudiced the jurors in this case, two of whom were black, as were the defendant and the victim. The defendant's counsel on appeal also has failed to enlighten this court on that subject. Although the motion for a mistrial was denied, the court did give a curative instruction to the jurors, as the defendant suggested, advising them that the cartoon had no bearing on the issues they were to decide.

The inquiry conducted by the trial court, as a result of reading the *Brown I* decision, five days after the verdict might well have satisfied the requirement of *Brown II* for a preliminary inquiry into allegations of jury misconduct if it had taken place when the court first learned of the allegations. "Our requirement that any allegations of jury misconduct necessitate some type of a preliminary inquiry still leaves the form and scope of such an inquiry to be determined by the trial court within the exercise of its discretion." Id., 529. The prohibition against questioning of the jurors by counsel would not exceed the discretion of the trial court in conducting such a preliminary proceeding and might serve to reduce the risk of antagonism toward counsel on the part of jurors subjected to a vigorous examination by counsel. Despite that restriction, counsel were

not precluded from suggesting areas of inquiry for the court to pursue concerning the cartoon incident. Counsel for the defendant never attempted to do so and made no response to the court's statement that it was satisfied that the cartoon had "played no part prejudicial to the defendant in connection with the jury's deliberations in the case." We conclude that there was no abuse of discretion on the part of the trial court.

## II

### ADMISSIBILITY OF VICTIM'S RECORDED STATEMENT

The first witness for the state was the victim, who testified that she had dated the defendant from 1988 until early 1994 and that he was the father of the youngest of her three children. When the prosecutor asked about what had happened on the morning of February 21, 1994, the date of the crimes charged in the information, she said she did not want to testify against the defendant. She testified that she had given a statement about what had happened on that date to a detective and repeated that she did not want to testify.

Outside the presence of the jury, in response to further questioning by the prosecutor, the victim testified that she recognized her statement and it was accurate. She did not want to testify about the incident, however, which had occurred more than one year before. She recalled giving a detective a tape-recorded statement on the date of the incident and had signed a transcription of it. She insisted, nevertheless, that she had forgotten about it. She identified her signature on the transcribed statement. Over the objection of the defendant, the court concluded that there was an inconsistency by omission between the victim's testimony and her prior statement, because she declined to say anything in court about what had happened on the date of the incident.

The court admitted both the tape recording and the transcribed statement. The jurors were given copies of the statement, and the recording was played in court. After the admission of those exhibits, the victim testified without referring to her statement about the events of February 21, 1994, and also about the circumstances of the witness tampering charge. The defendant cross-examined her about her testimony in court and also about the facts contained in her statement.

Prior to *State* v. *Whelan*, 200 Conn. 743, 748–49, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), the courts of this state had followed "the traditional view that a prior inconsistent statement of a nonparty witness is inadmissible hearsay if offered to prove the truth of the matters asserted therein, and, therefore, is admissible only for impeachment purposes." In *Whelan*, our Supreme Court created an exception to the hearsay rule "allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." Id., 753. In a footnote, the court observed that "prior tape recorded statements possess similar indicia of reliability and trustworthiness to allow their substantive admissibility as well." Id., 754 n.9.

The defendant claims that *Whelan* is inapplicable in this case because the victim never refused to answer the questions asked of her and because her testimony in court is consistent with her prior statement. Our Supreme Court rejected a similar claim in *Whelan* with respect to a prosecution witness who had given a statement to the police but who, at trial, could not recall specific details of the crime contained in his statement. Id., 748–49 n.4. "A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made. Thus, inconsistencies may be found in

changes in position and they may also be found in denial of recollection." Id.

"Whether there are inconsistencies between the two statements is properly a matter for the trial court. . . . Inconsistencies may be shown not only by contradictory statements but also by omissions. In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined." (Citations omitted.) Id. We conclude that there is no merit to the defendant's challenge of the ruling admitting the victim's statement to the police for substantive purposes.

## III

## EXCLUSION OF INCONSISTENT STATEMENTS OF VICTIM

The defendant's final claim is that the trial court improperly excluded the testimony of his mother[2] and stepfather to the effect that the victim told them soon after the incident that she had not been raped by the defendant. During the presentation of the state's case, the victim testified that she had been raped by the defendant and had told police officers, hospital personnel and the defendant's mother and stepfather soon after the incident that the defendant had raped her. Her testimony of a timely complaint was supported by a police officer and a physician from the hospital to which

[2] In his brief, the defendant claims that the testimony of his mother, as well as that of his stepfather, concerning inconsistent statements made by the victim, was excluded by the trial court. Our review of the transcript indicates that the defendant's mother was allowed to testify to the inconsistent statements of the victim during her cross-examination by counsel for the defendant on June 6, 1995, and also when she testified on direct examination as a witness for the defendant on June 9, 1995. Only once did the trial court sustain an objection to the mother's testimony on that subject and, when the same question was asked again by the defendant shortly thereafter, no objection was raised, and she responded fully to the inquiry.

the police had taken her after interviewing her at her home. The defendant's mother, whom the state also called as a witness, testified, however, that when she and her husband arrived home and found the defendant and the victim there, she asked her son whether he had tried to rape the victim. Before he could answer, the victim volunteered that the defendant had not tried to rape her. The mother also testified that her husband asked the victim, as they were driving to her home, whether she had been raped and that she responded that she had not been raped. The state raised no objection to the mother's testimony.

When the defendant's stepfather testified, defense counsel attempted several times to elicit his testimony concerning the victim's response to his inquiry whether she had been raped. Each time, the trial court sustained the state's objection on hearsay grounds. On one occasion, when the witness answered counsel's question prior to the state's objection, he testified that the victim had answered "No" to that inquiry. The court ordered the answer stricken and told the jury to disregard it.

The court excused the jury at defense counsel's request so that he could make an offer of proof. The defendant's stepfather was then permitted to testify that, when his wife asked her son whether he had raped the victim, she spoke before he could answer and said that the defendant had not raped her. The stepfather also testified that he had asked the victim whether she had been raped when he was driving her to her home and that she had responded "No." The witness testified further that he relied on that response, as well as a negative response to a similar question he asked of the defendant, in deciding to allow the defendant to continue to reside in the house after the incident.

Although defense counsel claimed initially that the proffered testimony was admissible on other grounds,

at the conclusion of his offer of proof he also argued that such evidence could be used to impeach the victim's testimony. The court, nevertheless, sustained the state's objection to the evidence offered.

On appeal, the state concedes that the ruling was incorrect and that the excluded testimony of the stepfather "generally would have been admissible pursuant to the prior inconsistent statement exception to the hearsay rule." "The inconsistent statement must be relevant and of such a kind as would affect the witness' credibility, and, generally, a foundation for introducing the statement should be laid at the time of cross-examination of the witness." *State* v. *Butler*, 207 Conn. 619, 626, 543 A.2d 270 (1988). Defense counsel, in cross-examining the victim, had asked whether she had responded negatively to the inquiries of the defendant's mother and his stepfather as to whether the defendant had raped her. The victim testified that she had told them that the defendant had "made" her have sex with him. "Where the witness denies having made the statement or is unable to recall having done so, extrinsic evidence may be admitted to show it was made." Id. There was a sufficient foundation for admission of the testimony of the defendant's stepfather concerning the victim's statements soon after the incident contradicting her testimony at trial.

Despite its concession that the excluded testimony was properly admissible, the state maintains that a reversal of the judgments is not warranted because (1) the defendant did not adequately state the ground that supports its admissibility and (2) the error was harmless. There is little substance to the first claim. Prior to his offer of proof, defense counsel stated several different grounds for admitting the testimony concerning the victim's responses to the inquiry whether she had been raped. At the conclusion of that offer, however, he raised an additional claim that the testimony

could properly be used to impeach the victim's testimony that she had been raped. The state's argument that his failure to use the phrase "prior inconsistent statements" rendered his articulation of the ground he relied upon unclear or inadequate is of insufficient merit to warrant further discussion.

There is merit, however, in the state's claim of harmless error. Before the defendant's stepfather testified, the jury heard the testimony of the defendant's mother concerning the victim's negative responses to the inquiries of both the mother and the stepfather as to whether the victim had been raped. The state had raised no objection to that testimony. The excluded testimony of the defendant's stepfather was largely repetitious of his mother's testimony. One factor to be considered in determining whether an improper ruling on evidence is a harmless error is "whether the testimony was cumulative . . . ." *State* v. *Milner*, 206 Conn. 512, 529, 539 A.2d 80 (1988).

Neither in brief nor oral argument has counsel for the defendant even attempted to explain how the claimed falsity of the victim's statement that she had been raped could have had an impact on the findings of guilt on any of the crimes of which the defendant was convicted. In finding the defendant guilty of kidnapping in the second degree with a firearm,[3] which requires only the

---

[3] General Statutes § 53a-94a provides: "Kidnapping in the second degree with a firearm: Class B felony: Three years not suspendable. (a) A person is guilty of kidnapping in the second degree with a firearm when he commits kidnapping in the second degree, as provided in section 53a-94, and in the commission of such offense he uses or is armed with and threatens the use of or uses or displays or represents by his words or conduct that he possesses a pistol, revolver, machine gun, shotgun, rifle or other firearm. No person shall be convicted of kidnapping in the second degree and kidnapping in the second degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information.

"(b) Kidnapping in the second degree with a firearm is a class B felony for which three years of the sentence imposed may not be suspended or reduced by the court."

abduction of another person and a representation by words or conduct that the actor possesses a firearm, and not guilty of kidnapping in the first degree,[4] which contains as one aggravating element an intent to abuse the other person sexually, the jury may well have had a reasonable doubt that a rape occurred.[5] The abduction and firearm possession elements of that crime were supported not only by the victim's testimony but also by that of a neighbor who observed the defendant pulling the victim, who was screaming, toward his truck and heard him threatening to shoot some people who had approached him.

Similarly, doubt about the victim's claim of rape may explain the jury's finding of not guilty of sexual assault in the first degree,[6] which required proof of sexual intercourse under the circumstances of this case, and guilty

[4] General Statutes § 53a-92 provides: "Kidnapping in the first degree: Class A felony. (a) A person is guilty of kidnapping in the first degree when he abducts another person and: (1) His intent is to compel a third person (A) to pay or deliver money or property as ransom or (B) to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function.

"(b) Kidnapping in the first degree is a class A felony."

[5] The charges of kidnapping in the first degree and kidnapping in the second degree with a firearm were contained in separate counts and the jury rendered separate verdicts on each count. Because kidnapping in the second degree with a firearm contains the requirement that the kidnapping be connected in some manner with a firearm, it is not an offense included within kidnapping in the first degree, which does not contain that element.

[6] General Statutes § 53a-70 provides: "Sexual assault in the first degree: Class B felony: Nonsuspendable sentences. (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person, or (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person, or (3) commits sexual assault in the second degree as provided in section

of sexual assault in the third degree,[7] which required only sexual contact. Although the victim's testimony concerning the rape was the sole basis for the conviction of third degree sexual assault, the possibility that the excluded testimony of the stepfather would have resulted in a not guilty verdict on that offense is too remote to justify a reversal of that conviction. Only an extreme application of the ancient doctrine of falsus in uno, falsus in omnibus could produce such a result. 3A J. Wigmore, Evidence (Chadbourne Rev. 1970) §§ 1008 through 1015.

The defendant's conviction for assault in the second degree is based on his act of striking the victim on the side of her head with a large beer bottle after he entered her home and their argument began. On cross-examination of the defendant, he admitted striking the victim with a beer bottle but denied that he had intended to injure her seriously, as required for a conviction of assault in the second degree in the circumstances of this case.[8] Whether the victim was truthful in claiming

53a-71 and in the commission of such offense is aided by two or more other persons actually present.

"(b) Sexual assault in the first degree is a class B felony for which one year of the sentence imposed may not be suspended or reduced by the court or, if the victim of the offense is under ten years of age, for which ten years of the sentence imposed may not be suspended or reduced by the court."

[7] General Statutes § 53a-72a provides: "Sexual assault in the third degree: Class D felony. (a) A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person, or (B) by the threat of use of force against such other person or against a third person, which reasonably causes such other person to fear physical injury to himself or herself or a third person, or (2) engages in sexual intercourse with another person whom the actor knows to be related to him or her within any of the degrees of kindred specified in section 46b-21.

"(b) Sexual assault in the third degree is a class D felony."

[8] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person . . . ."

that the defendant raped her after transporting her to his residence is only remotely related to this assault conviction.

The conviction for tampering with a witness[9] is based on the testimony of the victim that, approximately one month after the other offenses, the defendant telephoned the victim and threatened to kill her if she did not drop the charges for which he had been arrested. The excluded testimony about earlier inconsistent statements of the victim has little bearing on whether he was guilty of witness tampering.

We conclude that the exclusion of the testimony of the defendant's stepfather concerning the victim's responses to his inquiries as to whether she had been raped by the defendant was a harmless error.

The judgments are affirmed.

In this opinion the other judges concurred.

---

[9] General Statutes § 53a-151 provides: "Tampering with a witness: Class D felony. (a) A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about to be instituted, he induces or attempts to induce a witness to testify falsely, withhold testimony, elude legal process summoning him to testify or absent himself from any official proceeding.

"(b) Tampering with a witness is a class D felony."