STATE OF CONNECTICUT *v.* ANGEL L. RODRIGUEZ
(13252)

HEALEY, CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued November 10, 1988—decision released March 7, 1989

*William B. Collins,* special public defender, for the appellant (defendant).

*Vincent J. Dooley,* deputy assistant state's attorney, with whom, on the brief, was *Kevin McMahon,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. After a trial to the jury on a substitute information,[1] the defendant, Angel Rodriguez, was convicted of the crimes of kidnapping in the first degree with a firearm in violation of General Statutes § 53a-92a (a)[2] and of sexual assault in the

[1] The substitute information was in four counts and charged the defendant with four crimes: kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A); kidnapping in the first degree with a firearm in violation of General Statutes § 53a-92a (a); sexual assault in the first degree in violation of General Statutes § 53a-70 (a); and sexual assault in the first degree with a deadly weapon in violation of General Statutes § 53a-70a.

[2] General Statutes § 53a-92a (a) provides: "KIDNAPPING IN THE FIRST DEGREE WITH A FIREARM: CLASS A FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of kidnapping in the first degree with a firearm when he commits kidnapping in the first degree as provided in section 53a-92, and in the commission of said crime he uses or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, machine gun, shotgun, rifle or other firearm. No person shall be convicted of kidnapping in the first degree and kidnapping in the first degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information."

first degree with a deadly weapon in violation of General Statutes § 53a-70a.[3] This appeal followed.

On appeal, the defendant claims that the trial court erred in permitting a juror to testify at his trial concerning a conversation between that juror and the defendant, thus denying him due process of law and a fair trial. We find no error.

From the conflicting evidence presented at trial, the jury could reasonably have found the following: Prior to October 18, 1985, the defendant and the victim R had lived together for several years. Although they were not married, the defendant was the father of R's third child. They had lived apart for several months prior to October 18, 1985, during which time he sought to return on two or three occasions. R refused to permit this.

At about 8:15 p.m. on October 18, 1985, R and her friend, Maria Centeno, went to the Aqui Mequedo International Restaurant on Main Street in Hartford. Upon their arrival in front of the restaurant, they were met by the defendant. An argument ensued in front of the restaurant during which the defendant swore at R and slapped her several times in the face. He then grabbed R by the hair and, holding her, forced her to walk to his van. Centeno walked behind them along the

---

[3] General Statutes (Rev. to 1985) § 53a-70a (a) provides: "SEXUAL ASSAULT IN THE FIRST DEGREE WITH A DEADLY WEAPON: CLASS B FELONY; FIVE YEARS NOT SUSPENDABLE. (a) A person is guilty of sexual assault in the first degree with a deadly weapon when such person commits sexual assault in the first degree as provided in section 53a-70, and in the commission of such offense he uses or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a deadly weapon. No person shall be convicted of sexual assault in the first degree and sexual assault in the first degree with a deadly weapon upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information."

street to the van. On the way to the van, the defendant displayed a pistol to R and threatened her.[4]

The defendant took R to a motel in Newington, where inside one of the rooms he asked her to renew their terminated relationship. When she refused, he threatened her with a pistol by pointing it at her head and then putting it in her mouth. He then removed her clothes and had vaginal intercourse with her against her will. After intercourse, she washed herself at the motel.

After this incident, the defendant drove R to her home. Upon their arrival, the defendant and R learned that the police had been notified[5] and the defendant left. R told the police what had taken place. Despite some pain, she did not seek medical attention, although the police asked her to go to the hospital to be examined. R did, however, give the police the panties that she had worn after the assault and accompanied the police to the motel where the incident took place. The chief state toxicologist testified that the panties were examined for the presence of semen and the tests were positive.

We turn now to the circumstances involving the defendant's claim. Selection of a jury of six and two alternates began on Tuesday, July 7, 1987. Five jurors were selected on that date and each juror was sent home after his or her selection and ordered to return on the morning of Friday, July 10, 1987. Scott Han-

---

[4] R testified that she saw a gun. Centeno testified that she never saw a gun. Centeno followed them not only out of solicitude for R but because she herself felt threatened. Both R and Centeno testified that each of them had to get into the defendant's van. R and Centeno each testified that it was about a five minute walk from the restaurant to the van. Each also testified that the defendant stopped the van and let Centeno out near her home.

[5] A Hartford policewoman who went to R's home on the night of the assault testified that Centeno had notified the police.

nan was voir dired as a prospective juror on Wednesday, July 8, 1987, and selected on that date as the sixth juror. He was also sent home with instructions to report on July 10, 1987. Two alternates, James Bishop and Allan LaChappelle, were also selected on that date. Court was then adjourned to Friday, July 10, 1987.

On the morning of July 10, 1987, before the jury and the alternates were sworn, the court said that "counsel has been alerted that this morning, the Court was informed by the jury clerk that one of the jurors on the panel [Scott Hannan] reported to the jury clerk being approached by the Defendant. And the manner in which the juror reported this incident, it does appear to the Court to be sufficient to disqualify the juror." The court further indicated that, prior to doing so, it would call the juror in and inquire about this event and that counsel would also have the opportunity to inquire. It also observed that "because of the manner in which the incident was reported by the jury clerk, if reported the same way, [it] would have some prejudice to the Defendant," but the trial court would make that determination after questioning Hannan.

Hannan then took the witness stand and indicated that the incident took place at approximately 9:15 a.m. that morning as he had just finished buying a pastry and milk at the truck that is downstairs outside the front of the court building. He said that the defendant, whose name he knew because of what he had previously seen in court, "first approached" him and asked, "You don't know who I am, do you?" Hannan indicated that he did know who he was and then the defendant "began to say something else, started off with 'woman's' and as soon as I heard that I cut him off." He then told the defendant that he did not think that he should be talking with the defendant. Hannan then said: "[The defendant] agreed. He acknowledged it; he said, 'O.K., I understand.' And that was the end of it.

And I wasn't sure what I should do. So I asked the clerk." During further testimony by Hannan,[6] he said that he harbored no bias or prejudice about sitting on the case and that he would not let the incident "influence [his] judgment at all."

In the absence of Hannan, the state expressed concern over the incident possibly playing a role in the trial in "perhaps—consciousness of guilt" as well as "potential further criminal charges." The state also indicated that it intended to call Hannan as a witness, for which he would have to be disqualified as a juror, and that it intended "to show similar consciousness of guilt evidence," saying that it anticipated bringing out that "[the defendant had] approached other witnesses." Defense counsel argued against disqualifying Hannan maintaining that the incident related was not probative, as the state claimed, and that Hannan had said that it had not influenced or prejudiced him. Sensing that the court might excuse Hannan, defense counsel then noted that, if that in fact took place, it would mean that the remaining jurors would then be familiar with and know a witness in the case. The court was concerned about the defendant's approach to Hannan, noting that the defendant had sat through the voir dire and heard the court admonish the jurors not to talk to anyone about the matter.

---

[6] Hannan also testified that as soon as he "got to the truck, [the defendant] walked up behind [him]" and at this time there were "one or two" people standing in front of Hannan at the truck. Although Hannan noticed the defendant standing there, he tried to avoid contact with Rodriguez.

Thereafter, and before talking to the clerk who told him not to mention it to anyone, Hannan went upstairs in the courthouse and he "sort of wasn't too sure what [he] should do," and he did mention the incident to two persons. One of these was a member of the initial group of jurors that constituted the panel from which the defendant's jury was actually selected; that person had been voir dired as a prospective juror and was excused by the state. The other person Hannan spoke to was in the courthouse on jury duty but had not been on the panel from which the defendant's jury was selected. Hannan testified that he had asked both not to say anything.

Hannan thereafter returned to the courtroom and, upon further inquiry by the court, said that the other jurors chosen knew that he also had been selected as a juror, that he had "a general conversation [with them] as a group" but not about the case, and that they knew he was in the courtroom "right now" but that they had no idea why he was there.

Proceeding again in the absence of Hannan, the court noted that the question now arose whether the defendant would request a mistrial concerning the balance of the panel. The state argued that there was no "additional prejudice" arising from letting Hannan testify before the "five same jurors" or "six totally different jurors," especially because the defendant's conduct created the problem. The court opined that the matter of prejudice could best be met by inquiring of the remaining jurors. Defense counsel moved for a mistrial, arguing that it would be highly prejudicial to have Hannan testify before his fellow jurors, maintaining that Hannan "had to [have formed] some kind of relationship with them" having spent a number of hours a day "with this group of people for the last week."

After a luncheon recess, the state reiterated its intention to call Hannan as a witness on the matter of consciousness of guilt. The defendant again moved for a mistrial, making his motion under Practice Book § 887.[7] The court again said that it was going to voir dire the remaining jurors not only to ascertain whether "this has created any particular bias or prejudice," but also "whether or not anybody ever approached them." A

---

[7] Practice Book § 887 provides: "Upon motion of a defendant, the judicial authority may declare a mistrial at any time during the trial if there occurs during the trial an error or legal defect in the proceedings, or any conduct inside or outside the courtroom which results in substantial and irreparable prejudice to the defendant's case. If there are two or more defendants, the mistrial shall not be declared as to a defendant who does not make or join in the motion."

further motion for mistrial was made, which was denied, and the defendant took an exception. Hannan returned to the courtroom and the court excused him from sitting on the case, indicating that counsel for the state wanted to talk with him. Thereafter, the court adjourned.

On Monday, July 13, 1987, the defendant objected to the proposed voir dire of the remaining jurors, maintaining that they would "have to have a bias or prejudice, because [Hannan is] a fellow juror of their[s] . . . . " Thereafter, the trial court itself separately questioned each of the remaining five jurors and the two alternates. That voir dire indicated that, if Hannan testified as a witness, none of them would have any bias or prejudice for or against his testimony and that none of them had overheard any discussion of the case or discussed it with anybody else. A renewed defense motion for mistrial was denied and an exception taken. Thereafter, the jury of six and one alternate was sworn.

The state presented ten witnesses in its case-in-chief. The first witness to testify for the state was R, the victim of the crimes alleged. Hannan was the state's second witness; he testified after further objection by the defendant. He testified that, as he stood in line to buy a pastry and milk at the coffee truck, he noticed the defendant standing behind him "three—four—five feet away." Hannan glanced up several times to see if the defendant was still standing where he first noticed him and "[the defendant] was moving along the same as [Hannan] was," "[the defendant] definitely could see [Hannan]" as "he was facing directly toward [Hannan]." After Hannan paid for his food and started to walk away, the defendant approached him and asked, "you don't know me, do you?" Hannan answered, "yes," and as he started "walking toward the door, to go into the courtroom," the defendant "started say-

ing something about 'woman's' " and Hannan cut him off and told the defendant that he (Hannan) "didn't believe that [Hannan] should be speaking to him." Hannan testified that the defendant responded, "I understand." Hannan had the "impression" that the defendant knew who he was. In Hannan's mind, when the defendant said "woman's," Hannan "definitely" believed that he was going to start talking about the case.[8]

During the trial, the state, in addition to offering Hannan's testimony on the issue of consciousness of guilt, presented other evidence that it argued went to that issue. This included testimony by R that, about

[8] When the defendant testified at the trial, he admitted that he spoke to Hannan at the coffee truck. When defense counsel asked what his intention was when he spoke to Hannan, he answered:

"A. My intention was not to—because he was in the coffee line. I was behind about two [or] three feet away, because I was going to get coffee, too, on the same line. He turned around, and said 'Hi,' with his head. I repeated 'Hi,' back to him. And I told him—first he goes—when he said 'Hi' to me, I turned and say, 'You remember me, huh?' And he say, 'Yes, I do.' That's when he say, 'You know I'm not allowed to talk to you.' I told him, 'Yes, I understand that.'

"Q. Did you make any attempt to pursue the conversation after that?

"A. No, I didn't.

"Q. Did you have any intention of discussing anything involving the case with him?

"A. No.

"Q. This Court case?

"A. No."

He also said, on direct examination, that he made no attempt to pursue the conversation after that and that he did not have any intention of discussing anything involving the case with Hannan.

On cross-examination, the defendant said that he did not "follow [Hannan] at the time" because he, like Hannan, was there to buy coffee, which he did. The defendant denied that he made any statements that included the word "woman's" or that he said anything like that. He admitted being in the courtroom when each of the jurors and Hannan were instructed not to discuss the case and that he heard those instructions, but he maintained that he started talking to Hannan because Hannan had said "Hi" to the defendant first. He testified that the only thing he said "was only if he knows me; so he knows me, that's all. I didn't say nothing particular."

two weeks after the alleged assault, the defendant offered her money to drop the charges. Centeno testified that, about two weeks before the trial, the defendant spoke to her and asked her to say everything "was a lie." She said she went to see the defendant's attorney and told her that "everything that [R said] was a lie." Centeno, however, at the trial, repudiated her repudiation. At the trial, the state also elicited evidence from the defendant that, although he was working prior to October 18, 1985, he never returned to that job but just quit and lived in New Britain. This evidence was cast in terms of consciousness of guilt or flight or the defendant's making himself inaccessible. Other similar evidence was the defendant's testimony that he failed to visit his child from October 19, 1985, until his arrest in March, 1986. Further evidence of flight or inaccessibility was introduced through Flynn O'Keefe, the defendant's probation officer, who said that the defendant reported to her on September 9, 1985, but failed to keep his next appointment on October 25, 1985. He did, however, see her on December 31, 1985, at which time O'Keefe said that he indicated that approximately one and one-half months earlier he had had a fight with his wife, that his wife later told him that she had filed a complaint and that there was a warrant outstanding in that matter.[9]

During the final arguments, counsel emphasized the crucial nature of the issue of credibility. Counsel for the state reviewed the evidence, stressing the issues of consciousness of guilt and flight. In doing so, he discussed Hannan's testimony.

Certain legal principles that are helpful in resolving the issue before us are appropriately set out at this point. It cannot be questioned that the due process

---

[9] O'Keefe testified for the state on rebuttal after the defendant had testified that he did not know until March, 1986, that the police had a warrant for him, at which time he immediately turned himself in to the police.

clause of the fourteenth amendment extends to state court defendants the right to be tried by an impartial jury. *Nebraska Press Assn.* v. *Stuart,* 427 U.S. 539, 551, 96 S. Ct. 2791, 49 L. Ed. 2d 683 (1976); *Ristaino* v. *Ross,* 424 U.S. 589, 595 n.6, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976); *Duncan* v. *Louisiana,* 391 U.S. 145, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968) (sixth amendment right to jury trial); *Irvin* v. *Dowd,* 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961) (due process right to trial by an impartial jury). The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given them in the adversary arena after proper instructions on the law by the court. See *Turner* v. *Louisiana,* 379 U.S. 466, 472–73, 85 S. Ct. 546, 13 L. Ed. 2d 424 (1965); *Patterson* v. *Colorado,* 205 U.S. 454, 462, 27 S. Ct. 556, 51 L. Ed. 879 (1907). We have noted that the right to a fair trial is implicit in the term "due process of law." *State* v. *Asherman,* 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); *State* v. *Echols,* 170 Conn. 11, 13, 364 A.2d 225 (1975). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith* v. *Phillips,* 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982). This is wholly in keeping with our view of jury impartiality as a core requirement of the right to trial by jury. *State* v. *Brigandi,* 186 Conn. 521, 542, 442 A.2d 927 (1982). "In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during

the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the [prosecution] to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. *Mattox* v. *United States,* 146 U.S. 140, 148–50 [13 S. Ct. 50, 36 L. Ed. 917 (1892)] . . . . " *Remmer* v. *United States,* 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954); *United States* v. *Hillard,* 701 F.2d 1052, 1061 (2d Cir.), cert. denied, 461 U.S. 958, 103 S. Ct. 2431, 77 L. Ed. 2d 1318 (1983). Where an accused makes a plausible claim that his constitutional right to a fair trial may be violated because the jury is not impartial, the burden is upon the state to rebut the presumption of prejudice that denies a fair trial. See, e.g., *Remmer* v. *United States,* supra.

A trial judge is generally in the best position to evaluate the critical question of whether the juror's or jurors' exposure to improper matter has prejudiced a defendant. See, e.g., *United States* v. *Wiley,* 846 F.2d 150, 157 (2d Cir. 1988); *State* v. *Asherman,* supra, 736. A trial court has wide discretion in deciding how to pursue an inquiry into the nature and effect of information that comes to a juror improperly as well as its potential effect upon the jury if it learns of it. See generally *Marshall* v. *United States,* 360 U.S. 310, 312, 79 S. Ct. 1171, 3 L. Ed. 2d 1250 (1959); *Remmer* v. *United States,* supra, 229–30; *United States* v. *Hillard,* supra, 1064. Where, as here, the impartiality of the jury was challenged by a motion for mistrial, the trial court's determination will be reversed only where it can fairly be said that it abused its discretion in denying the mistrial. See generally *United States* v. *Wiley,* supra, 158; *State* v. *Brigandi,* supra, 543–44. In noting that a trial court has wide discretion in passing on motions for mistrial, we have said that " '[t]he general principle is that a mistrial should be granted only as a result of some

occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated.' " *State* v. *Brigandi,* supra, 543; *State* v. *Cavros,* 196 Conn. 519, 526, 494 A.2d 550, cert. denied, 474 U.S. 904, 106 S. Ct. 233, 88 L. Ed. 2d 232 (1985); *State* v. *Marra,* 195 Conn. 421, 436, 489 A.2d 350 (1985).

In our analysis of this case, we first point out that the core impartiality of a jury in a criminal trial presents an unusual problem where a "sitting juror" is called upon to be, and becomes, a witness in the very proceeding that he and his fellow jurors were carefully selected to decide. We have already set out at length the relevant circumstances in the record that, upon application of appropriate legal principles, demonstrate that the trial court did not abuse its discretion in denying a mistrial. We reject the state's claim that the essential claim of error involves only an evidentiary claim, i.e., weighing the probative value of Hannan's evidence against its prejudicial effect, upon which the defendant has the burden. Rather, the defendant's preserved claim is of constitutional dimension directly implicating his due process right to a fair trial upon which the state has the burden of showing no reversible error. The state has sustained that burden.

Although Hannan was not a "sitting" juror, because the jury had not actually been sworn, and although the "trial" had not yet commenced insofar as the presentation of evidence to the factfinder to determine the defendant's guilt or innocence, cases involving attempts to influence conduct of a "sitting juror" where evidence is in the course of being presented to the jury furnish certain guidance. For example, in *Smith* v. *Phillips,* supra, 215, where, unlike this case, there existed a genuine issue as to juror misconduct, the United States Supreme Court said that it had "long held that the rem-

edy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." See *Remmer* v. *United States,* supra; *State* v. *Almeda,* 189 Conn. 303, 313, 455 A.2d 1326 (1983).

Where the constitutional due process guaranty of a fair trial before an impartial jury is fairly raised, as it is in this case, a presumption of prejudice to the defendant arises, which the state has the burden to rebut. The burden properly rests on the state for several reasons: the overarching importance of protecting the defendant's constitutional right to a fair trial, the continuing maintenance of the integrity of the jury system and the necessity of continuing to preserve the trust reposed in criminal jury verdicts.[10] In determining whether the state has successfully rebutted that presumption and, thereby, demonstrating that the defendant's right to a fair trial was not violated, it is necessary to decide whether the trial court abused its discretion in denying the mistrial.

The task of the trial court in this case was not only delicate, but also difficult because, as Chief Justice Hughes said in speaking about an impartial jury: "Impartiality is not a technical conception. It is a state of mind." *United States* v. *Wood,* 299 U.S. 123, 145, 57 S. Ct. 177, 81 L. Ed. 78 (1936), reh. denied, 299 U.S. 624, 57 S. Ct. 319, 81 L. Ed. 459 (1937). Although articulated in a dissenting opinion, Justice Harlan's state-

---

[10] The Seventh Circuit Court of Appeals, in noting that "[n]ot every improper ex parte contact with jurors requires a mistrial," also said that "[o]ur system of justice has not delegated to every reprobate the power to effect a mistrial." *United States* v. *Williams,* 737 F.2d 594, 612 (7th Cir. 1984), cert. denied, 470 U.S. 1003, 105 S. Ct. 1355, 84 L. Ed. 2d 377 (1985). Similarly, the Court of Appeals for the District of Columbia Circuit, while recognizing the long-standing rule against "unauthorized communications between jurors and others . . . in order to safeguard the accused's constitutional right to an impartial jury," said: "But courts must not allow this protection to 'delegate[] to every reprobate the power to effect a mistrial.' " *United States* v. *Williams,* 822 F.2d 1174, 1190 (D.C. Cir. 1987).

ment that " '[I]t is an impossible standard to require that tribunal [the jury] to be a laboratory, completely sterilized, and freed from any external factors' " brooks of little cavil. (Brackets in original.) *Parker* v. *Gladden,* 385 U.S. 363, 369, 87 S. Ct. 468, 17 L. Ed. 2d 420 (1966) (Harlan, J., dissenting), quoting *Rideau* v. *Louisiana,* 373 U.S. 723, 733, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963) (Clark, J., dissenting). Recently the United States Supreme Court, quoting *Smith* v. *Phillips,* supra, 217, said "that the constitution 'does not require a new trial every time a juror has been placed in a potentially compromising situation . . . [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' " *Rushen* v. *Spain,* 464 U.S. 114, 118, 104 S. Ct. 453, 78 L. Ed. 2d 267 (1983).

It is apparent that the trial court was concerned about the potential for "some prejudice" to the defendant if the incident, as reported by the jury clerk, actually occurred in that manner. Appropriately, it indicated that it would make that determination after questioning Hannan. The trial court did this in the presence of counsel for the state, as well as counsel for the defendant, and at that time Hannan reiterated that he could still be an impartial juror. In Hannan's absence, the trial court was then confronted with the state's claim that this incident might play a part in the upcoming trial perhaps on the issue of "consciousness of guilt," and that the state intended to call Hannan as a witness. The state also intended to show "similar consciousness of guilt evidence," claiming that the defendant had approached other witnesses.

In questioning Hannan, the trial court raised the prospect that, if he were excused as a juror to become a witness, then the defendant might claim a mistrial concerning the balance of the panel. Confronted with the state's intention to use Hannan as a witness, as well

as its position that the defendant be tried before this jury, and the defendant's claim that it would be prejudicial to have Hannan testify as a witness before a jury on which he had been selected to serve, the trial court decided that the best way of meeting the defendant's claim of prejudice was to go further and examine the remaining jurors and the two alternates. Significantly, it stated that it planned also to question them on "whether or not anybody ever approached them." This was done and each juror indicated that not only would each not have any bias or prejudice for or against Hannan's testimony, if he did testify, but also that none of them had discussed the case with anyone else or had overheard any discussions of the case. We appreciate that the testimony of the jurors themselves that each would be fair and impartial, while not determinative, is significant. See *Irvin* v. *Dowd*, supra, 727–28; *Bayramoglu* v. *Estelle*, 806 F.2d 880, 888 (9th Cir. 1986). We are not inclined to disregard the statements of those jurors interviewed as "inevitably suspect." *United States* v. *Williams*, 737 F.2d 594, 612 (7th Cir. 1984), cert. denied, 470 U.S. 1003, 105 S. Ct. 1355, 84 L. Ed. 2d 377 (1985); see *Smith* v. *Phillips*, supra, 217 n.7. In *Dennis* v. *United States*, 339 U.S. 162, 171, 70 S. Ct. 519, 94 L. Ed. 734 (1950), a jury impartiality case, the United States Supreme Court said: "One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." But in such an inquiry, which is essentially factual, the trial court that conducts it is in the best position to assess the testimony of those on the jury panel, including its impact on the fairness of the trial, and its conclusion is entitled to "substantial weight." *United States* v. *Madrid*, 842 F.2d 1090, 1092 (9th Cir. 1988); see *Rushen* v. *Spain*,

supra, 120; *State* v. *Brigandi,* supra, 543; *State* v. *Coburn,* 220 Kan. 743, 746–47, 556 P.2d 376 (1976). Considerable deference is to be accorded to the trial court since " '[t]he trial judge is uniquely qualified to appraise the probable effect of information on the jury, the materiality of the extraneous material, and its prejudicial nature.' " *United States* v. *Steele,* 785 F.2d 743, 746 (9th Cir. 1986), quoting *United States* v. *Bagnariol,* 665 F.2d 877, 885 (9th Cir. 1981), cert. denied, 456 U.S. 962, 102 S. Ct. 2040, 72 L. Ed. 2d 487 (1982).

It was only after this thorough inquiry by the trial court that it then excused Hannan as a potential juror, and decided, after denying the mistrial, to permit the case to proceed before the jury consisting of the five jurors originally selected with the addition of one of the alternates. In doing so, the trial court did not abuse its wide discretion. On the record before it, the trial court could have found that the state had successfully rebutted the presumption of prejudice to the defendant and that he could receive a fair trial before that jury. While the trial court could initially have discharged the jurors and alternates originally selected and drawn a new jury, the alternative it adopted properly protected the defendant's right to a fair trial and was not an abuse of discretion.

Because of the unique circumstances of this case, including the fact that the presentation of all of the evidence actually took place *after* the challenged motion for a mistrial, we have examined the entire record of the trial in order to determine whether a constitutionally fair trial ensued. In doing so, we point out that the denial of the mistrial was not a ruling that can be constitutionally or conceptually compartmentalized once made or preserved in a procedural cocoon for appellate review. It was a ruling that permitted this jury to hear all of the evidence and decide the defendant's guilt or innocence after a trial during which Hannan testified.

The trial transcript discloses that guilt or innocence did not hinge upon any "swearing" contest solely between those witnesses allegedly involved in this crime. It is true that R, the victim, and her friend, Centeno, told one version of the incident that the defendant, who testified, denied. There was, however, as we have already pointed out, considerable evidence that went to "consciousness of guilt" other than that offered by the state through Hannan. Briefly, that encompassed (1) the evidence of the defendant's offer of money to R to drop her complaint, (2) the defendant's effort to have Centeno repudiate her statement inculpating him, (3) the defendant's own testimony that he did not visit his child who lived with R after the incident of October 18, 1985, until his arrest in March, 1986, (4) the defendant's own testimony that, as of the day after the alleged assault, he never returned to a job which he had held up to that time, and (5) the testimony of Keefe, his probation officer, concerning his failure to report and his December, 1985 reference to a complaint of R against him. The defendant's testimony before the jury included his version of the contact with Hannan.

The record of the entire trial discloses that nothing occurred during the trial that derogated from the defendant's right to a fair trial. The trial court was entitled, as we are, to assume that the jurors not only followed its instructions at the end of the trial but also its instructions during its individual voir dire.[11] Moreover, on a number of occasions during its final instructions to the jury, the trial court cautioned the jury to decide the case on the evidence disclosed in court and

[11] During its final instructions, the trial court, in referring to the evidence, included references of that evidence claimed to go to consciousness of guilt and it also instructed on the law in that regard. See, e.g., *State* v. *Moynahan,* 164 Conn. 560, 595–96, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973).

the law. "The jury, in the absence of a fair indication to the contrary, is presumed to have followed the instructions of the court." *State* v. *Glenn,* 194 Conn. 483, 497, 481 A.2d 741 (1984); *State* v. *Moye,* 199 Conn. 389, 396, 507 A.2d 1001 (1986). There is no fair indication to the contrary in the record.

In appeals involving a claim that a criminal defendant's jury was not impartial as constitutionally mandated because of some incident involving the jury, our focus is not solely on the alleged incident, but also on whether ultimately that incident generated prejudice such that the defendant was denied his right to a fair trial. "The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome." *State* v. *Bausman,* 162 Conn. 308, 312, 294 A.2d 312 (1972); *State* v. *Brigandi,* supra, 543. The trial court did not abuse its discretion in denying a mistrial; this defendant received a fair trial.

There is no error.

In this opinion the other justices concurred.