## BRENDA SAWICKI *v.* NEW BRITAIN GENERAL HOSPITAL ET AL.
### (AC 29597)

Bishop, Harper and Foti, Js.

[4] In light of this disposition, we need not reach the issue of sovereign immunity.

Argued March 18—officially released June 9, 2009

*Oliver B. Dickins*, for the appellant (plaintiff).

*Laura Pascale Zaino*, with whom, on the brief, were *Richard C. Tynan*, *June M. Sullivan* and *Brian J. Gedicks*, for the appellee (defendant Mandell & Blau, M.D.'s, P.C.).

### Opinion

BISHOP, J. The plaintiff, Brenda Sawicki, appeals from the judgment of the trial court rendered following a jury verdict in favor of the defendant Mandell & Blau, M.D.'s, P.C.[1] The plaintiff claims on appeal that the court

---

[1] New Britain General Hospital was also a defendant, but the complaint against it was withdrawn prior to trial. We therefore refer to Mandell & Blau, M.D.'s, P.C., as the defendant.

improperly denied her motion to set aside the verdict and for a new trial on the basis of juror misconduct. In response, the defendant claims, as an alternate ground for affirmance, that if the court had precluded the testimony of the plaintiff's expert witness as requested, the plaintiff could not have met her burden of persuasion, entitling the defendant to a directed verdict. Because we agree with the plaintiff's claim that she was prejudiced by juror misconduct and disagree with the defendant's claim regarding the plaintiff's expert witness, we reverse the judgment of the trial court.[2]

The following factual and procedural history is relevant to the resolution of the plaintiff's appeal. The plaintiff commenced this medical malpractice action on August 9, 2002. In her complaint, the plaintiff alleged that on August 2, 2000, she went to the defendant for a routine mammogram. A radiologist employed by the defendant noticed new masses and recommended further evaluation with an ultrasound. On August 8, 2000, the plaintiff returned to the defendant for further examination with an ultrasound. Instead of performing the ultrasound, a different radiologist decided that another mammogram would suffice. On the basis of a determination that the August 8 mammogram film was inconclusive, the defendant's radiologist recommended that the plaintiff return for an examination in the normal schedule. On June 4, 2001, the plaintiff returned to the defendant. A sonogram was performed that indicated two masses in the plaintiff's right breast. A mammogram performed on that same day demonstrated a mass in the plaintiff's right breast that was highly suggestive of malignancy. Two days later, on June 6, 2001, the plaintiff underwent a biopsy that revealed that the masses in the

---

[2] The plaintiff also claims on appeal that the court improperly denied her request to submit rebuttal testimony from one of her expert witnesses. Because we reverse the judgment on the basis of juror misconduct, we need not reach that issue.

plaintiff's right breast were carcinogenic. The plaintiff thereafter underwent a complete mastectomy and reconstruction of her right breast. Axillary nodes that were dissected during the mastectomy were positive for metastasis.

The plaintiff alleged in her complaint that the defendant breached the standard of care by not performing the recommended ultrasound on August 8, 2000. She further alleged that when the August 8, 2000 mammogram was as inconclusive as the August 2, 2000 mammogram, the defendant breached the standard of care by not following up and, instead, recommending that she return in the normal schedule. The plaintiff alleged that as a result of the defendant's negligence, the subsequent diagnosis of cancer in her right breast was too late because it had already metastasized. The plaintiff claimed that the delayed diagnosis deprived her of the chance of a full recovery and left her with a diminished life expectancy. The defendant claimed, by way of special defense, that the plaintiff's negligence was a substantial factor in causing her injuries. Specifically, the defendant alleged that the plaintiff negligently failed to return for follow-up examinations in December, 2000, and that following her mastectomy on July 10, 2001, she negligently refused to follow prescribed therapies and protocols for treatment.

Jury selection in this case commenced on June 7, 2006, and the presentation of evidence began on June 20, 2006. The jury deliberated and returned a verdict in favor of the defendant on July 19, 2006. Each juror affirmed the verdict in open court when individually polled. The plaintiff thereafter filed a motion to set aside the verdict and for a new trial, which was denied. This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first claims that the court improperly denied her motion to set aside the verdict and for a new trial in which she claimed, inter alia, that she was deprived of a fair trial due to juror misconduct. We agree.

The following facts are relevant to our discussion of the plaintiff's claim. In support of her motion to set aside the verdict and for a new trial, the plaintiff submitted affidavits from two of the trial jurors, P and G.[3] In their affidavits, which were essentially the same, P and G indicated that another juror, M, and other jurors had evaluated the evidence and stated their positions prior to the close of evidence and the court's submission of the case to the jury for deliberation. They averred that M stated his position on the case before any evidence had been taken and that he engaged other jurors in discussions of the merits of the case as the evidence was introduced. Following receipt of the plaintiff's motion, the court held an evidentiary hearing during which it questioned all of the jurors, with the exception of one L, who had died a few days before the hearing.

The court first questioned G. G testified that at some point after the verdict, she and P had dinner at the plaintiff's house with the plaintiff and her attorney where they discussed M's misconduct and where G agreed to sign an affidavit regarding what had occurred in the jury room. G also testified that M was very biased, particularly against women. She stated that "at one point, he said that—he said: 'I even let them know I was biased against her and they still kept me on the case.'" She further indicated that she also recalled him stating, "we know which way this case is going already," and, "she's gonna lose," and, "I can't believe they're

---

[3] In the interest of preserving the privacy of the jurors who served on this case, we refer to them by initials.

keeping me on this case."[4] G stated, "I'm not saying he persuaded other jurors to go the wrong way or the right way because I don't know what's what, okay, but I know that as a person, that I just—I just feel in my heart that I have—I had to do what I'm doing. You know, that I believe things he did [were] wrong."

P testified that he had been released from jury service a few days prior to deliberations due to a scheduled vacation and that when he returned from vacation and learned of the verdict, he called the plaintiff and told her that he "was sorry" and that "she shouldn't have lost . . . ." He indicated that he also "told her that I was going to call her on Friday when I was released because of all the talking that was going on in the back jury room while I was here up to that point. And, you know, from day two, when this other juror, [M] said that he wouldn't vote for [the plaintiff]. I mean, it started from the beginning, so I knew she was not gonna win." P stated that when he went to the plaintiff's house in late July or early August, where he met with the plaintiff, her attorney and G, they discussed "the people, the jury on the case and how I knew from the beginning that she would not have won because the first day when [M]—the second day when [M] came out and said he

---

[4] Early in the trial, on June 21, 2006, M sent a note to the court that stated, "Judge, I need to speak with you about a bias I have in this case." Upon receipt of the note, the court held a hearing at which M explained, "Well, I'm becoming—I'm wondering, it seems to me as though, this plaintiff is, you know, seems to be in control of business, family and everything, but when it comes to her own health, the whole thing, just let it fall by the wayside, just let it be in the hands of other people. And that doesn't seem consistent to me. That—she's in control of a huge business, family, all these responsibilities, but when it comes to a decision to get—to get a second opinion on a sonogram, that didn't happen."

M denied having discussed his opinion with other jurors and acknowledged hearing the court's instruction that he was not to make up his mind about the case until all evidence was submitted and the court had instructed the jury regarding the law. The court reminded M not to make up his mind until he heard all of the evidence and sent him back to the jury room.

wouldn't vote for her and then came back in the jury room back there and was laughing and saying that she can't win now because I'm still here. And everyone was talking about how this was a waste of their time and [a] frivolous case. I mean, I knew from the beginning [that] she wasn't going to win and I just had to keep it all to myself because you told me I couldn't talk to anybody."

P testified that following the testimony of one of the physicians, another juror, C, "came in and said that this case is over now because she saw all that she had to see." In response to C's comment, M "started to laugh and said this case has been over since the second day because when he came out here and said that he had an extreme bias toward the plaintiff and they kept him, and that was a bad mistake . . . because he would not vote for [the plaintiff] from the beginning." P testified that C "said she saw all she had to see after the algorithm was shown, that big chart. She said, at that point, [that] the whole, you know, part of the plaintiff's case was that she should have known when to come back. And she was pretty much saying that . . . after we saw the algorithm the case was done; we saw all that we had to see and, you know, her mind at that point must have been made up, is what I got out of what she said." P indicated that M and C commented that the testimony of the plaintiff's expert was wrong.

M testified next. He stated that when he returned to the jury room after the hearing regarding his note to the court, he told his fellow jurors what he had said in court, that he "found it inconsistent between, you know, her and the way she behaved after she found out about the, you know, the mammogram." He indicated that there "was a lot of discussion going on in the jury room . . . . A lot of people were . . . angry about the case, and there was a lot of discussion going on. Most of the

jury was talking." He stated that when the mammographer from New Haven testified on behalf of the defendant, "[p]eople made a lot of comments that that had been a very strong case, very strong point made." And "people expressed shock at the point that it was just so clear" that the plaintiff knew about the appointments.[5] The court asked M if he "follow[ed] the court's instructions regarding waiting to make up your mind before deciding the case?" M responded: "I—I kept looking for some sort of evidence, you know, to show that they, you know, that there was neglect. I was looking for it. I was waiting for it, and I never did see it. I—I didn't make up my mind. I really wanted to see, is there anything on the other side, and I never did see it." The court then asked, "Did you hear that from other jurors, that either they made up their mind . . . ." M responded: "No. I never heard that from anybody. People—I think people wanted, you know, some solid information that there was neglect, and we just never saw it." M indicated that during the trial, he heard comments from his fellow jurors, specifically C, that if the plaintiff had followed the advice of her physicians, she probably would have gotten better. M stated that he probably did express his opinion to the other jurors. He indicated that the most common comment that he heard was, "They just don't have a case." He stated: "I heard people say I haven't seen anything yet, I don't—you know, there's no evidence, things like that, they just don't have a case. . . . I think people were looking—I think a lot of people were probably like me, they were looking for some evidence, you know. I know I was looking for evidence. I mean, I hadn't—you know, I waited and waited for something to come along, and I never did see it." The court asked M whether, following the June

[5] Although it is not apparent from M's testimony specifically what "appointments" he was referring to, the import of his testimony is that jurors were expressing opinions about the evidence as it was being submitted and before deliberations, contrary to the court's instructions.

21, 2006 hearing at which the court addressed his note when he returned to the jury room, he had a bias. M responded, "I wiped my mind clean, and I was waiting for more information."

C testified that she did not discuss the case with any of her fellow jurors. She indicated that although she heard other jurors make comments about the case, she did not recall anything beyond cursory comments. C did recall that M was "extremely frustrated that [the plaintiff] refused all treatments that were offered to her." She recalled that early on in the trial, M had said "something to [the] effect that he felt his mind was already made up." She testified that he said that once or twice in the beginning of the trial. When the court asked C if she had followed its instruction to wait for all of the evidence and the court's charge before making up her mind, C responded affirmatively.

Another juror, K, testified next. She indicated that there was "a lot of general talk" and that most of the jurors commented on the credibility of the witnesses. She stated that the jurors compared the witnesses from California to the local witnesses. She recalled the foreperson, R, making a lot of general comments and P making a comment about not liking one of the parties. She also recalled C commenting on the size of the tumor and the different time frames. K testified that she did not specifically recall any comments suggesting that any of the jurors had made up their minds but that "[t]here could have been comments made like that." K also told the court, in response to the court's inquiry, that she followed its instruction to wait for all of the evidence and the court's charge before making up her mind.

S testified that she recalled jurors discussing the length of the trial and the financial problems that the length of the trial was causing them. She stated that

"nobody spoke about the case." She stated that "[M] had a bias toward the plaintiff because of filing the suit, and he felt that there was no case to be decided. And I think part of the reason was because of his financial situation and that it was a waste of time." S indicated that M expressed that opinion on a few occasions and that he would share his frustration with the other jurors "even day to day." S recalled M saying, beginning in the first days of trial, that he was against the plaintiff. She also recalled C having "some opinions about the case in the beginning," to the effect that she did not like the plaintiff or the way the plaintiff was going about the case. S testified that L stated that the case was a waste of his time and that he did not like the plaintiff for that reason, "almost as if placing blame. . . . He just said that he had a bias toward the plaintiff for that reason." She stated that the jurors shared their personal experiences with chemotherapy, but those discussions were not related to the case. S stated that both M and L expressed, before the case was submitted to them, that they would vote against the plaintiff. The court asked S if she had followed its instruction to wait for all of the evidence and the court's charge before making up her mind. S responded that she had followed the court's instructions and did not make up her mind before deliberating.

The foreperson, R, testified that he did not hear M express any opinions prior to deliberations. He recalled M being called out and then, upon returning, M stating, "They're not gonna let me go." R did not recall anyone expressing that either party was going to win or lose. He stated: "I can honestly say I don't believe anybody made up their mind before you gave us the okay, okay, now you've had everything, now go deliberate or discuss it. That's when we started discussing it."

Alternate juror B testified that he did not hear discussions or comments of his fellow jurors regarding the

case. He indicated that he followed the court's instructions to wait until he heard all of the evidence and the charge before making up his mind.

Alternate juror T testified that she did not hear any discussions or comments of her fellow jurors other than a few regarding the length of the trial and whether certain witnesses were hired to testify in certain cases. She did not recall hearing anybody express their opinions as to who should win or lose the case.

Following the hearing, the court issued a memorandum of decision denying the plaintiff's motion to set aside the verdict and for a new trial. The court found that some jurors engaged in misconduct because some "expressed opinions about evidence, and some about witnesses." The court found, however, that the plaintiff failed to sustain her burden of proving that the misconduct resulted in probable prejudice. This appeal followed.

"Our review of the trial court's action on a motion to set aside the verdict involves a determination of whether the trial court abused its discretion, according great weight to the action of the trial court and indulging every reasonable presumption in favor of its correctness . . . since the trial judge has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence." (Citations omitted.) *Palomba* v. *Gray*, 208 Conn. 21, 24–25, 543 A.2d 1331 (1988).

It is well settled that presubmission discussion of the evidence by jurors in any degree is not an acceptable practice and constitutes misconduct. See *State* v. *Washington*, 182 Conn. 419, 426, 438 A.2d 1144 (1980). It is equally well established, however, that not every incident of juror misconduct requires a new trial. *State* v. *Asherman*, 193 Conn. 695, 736, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed.

2d 814 (1985). The court found that there was juror misconduct in this case, and that finding has not been challenged on appeal. Thus, the issue we confront is whether the court properly determined that the plaintiff was not prejudiced by the misconduct.

"[T]he burden is on the moving party in a civil proceeding to establish that juror misconduct denied him a fair trial. . . . That burden requires the moving party to demonstrate that the juror misconduct complained of resulted in probable prejudice to the moving party. . . . In sum, the test is whether the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror." (Citation omitted; internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 104, 956 A.2d 1145 (2008).

"In reviewing juror misconduct, we use an objective standard in which the focus is on the nature and quality of the misconduct, rather than the mental processes of the jurors." (Internal quotation marks omitted.) *Harrison* v. *Hamzi*, 77 Conn. App. 510, 523, 823 A.2d 446, cert. denied, 266 Conn. 905, 832 A.2d 69 (2003). "The question is whether the misconduct is of such a nature that it probably rendered the juror unfair or partial. In determining the nature and quality of the misconduct we must be mindful that the concerns [are] not simply that the jurors may have discussed the evidence presubmission, but that they may have taken positions on the evidence. . . . Any inquiry into the content of the opinion or the impact it had on the juror is clearly impermissible." (Internal quotation marks omitted.) *State* v. *Castonguay*, 194 Conn. 416, 437, 481 A.2d 56 (1984).

"[T]he rule that prohibits the examination of the jurors' mental process excludes, as immaterial, evidence as to the expressions and arguments of the jurors

in their deliberations and evidence as to their own motives, beliefs, mistakes and mental operations generally, in arriving at their verdict. [C.] McCormick, Evidence (2d Ed.) § 68, p. 148." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Gilmore*, supra, 289 Conn. 106; see also Practice Book § 16-34 ("[u]pon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined").

"[Testimony] or affidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial or in the jury room, which does not essentially inhere in the verdict itself, as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot, or game of chance or other artifice or improper manner. . . . And . . . [e]vidence of the actual effect of the extraneous matter upon jurors' minds can and should be excluded, as such evidence implicates their mental processes, but receiving their evidence as to the existence of the condition or the happening of the event . . . supplies evidence which can be put to the test of other testimony (and thus sound policy is satisfied) and at the same time the evidence can serve to avert . . . a grave miscarriage of justice, which it is certainly the first duty of a court of conscience to prevent if at all possible." (Citation omitted; internal quotation marks omitted.) *Aillon* v. *State*, 168 Conn. 541, 551, 363 A.2d 49 (1975).

Examples of testimony that cannot be considered include "any matter which does essentially inhere in the verdict itself, as that the juror did not assent to the verdict; that he misunderstood the instructions of the

court; the statements of the witnesses or the pleadings in the case; that he was unduly influenced by the statements or otherwise of his fellow jurors, or mistaken in his calculations or judgment, or other matter resting alone in the juror's breast." (Internal quotation marks omitted.) *Josephson* v. *Meyers*, 180 Conn. 302, 310–11, 429 A.2d 877 (1980). "[J]urors [are] competent to testify to the occurrence of incidents during trial or during their deliberations which might have affected the result of the trial, but [cannot] testify as to the impact of such incidents on their verdict." *Hamill* v. *Neikind*, 171 Conn. 357, 361, 370 A.2d 959 (1976). The court "must apply an objective test, *assessing for itself*, whether or not, there is a likelihood that that influence would affect a jury outcome." (Emphasis added.) *Aillon* v. *State*, supra, 168 Conn. 549.

"Thus, a trial court may inquire about whether members of the jury observed the situation, whether they discussed it during deliberations, and whether they, as individuals, arrived at a fixed opinion as to the situation such that they were unable to deliberate with open and impartial minds. . . . Beyond that, however . . . a court may not tread. A court may not inquire as to [e]vidence of the *actual effect of the extraneous matter upon jurors' minds* because such evidence implicates their mental processes . . . . We conclude that, once a verdict has been reached, the proper inquiry does not involve a determination of what conclusions the jurors *actually* drew but, rather, of whether the jurors were aware of or actually exposed to the courtroom situation, whether it affected their ability to be impartial and whether it was of such a nature that it *probably* rendered the juror[s] unfair or partial." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Johnson*, 288 Conn. 236, 262–63, 951 A.2d 1257 (2008).

Here, the court did not follow the analytical path set forth by this decisional law. Rather than focus on the nature and quality of the jury misconduct, the court fastened its decision on responses by the jurors that they followed the court's jury instructions notwithstanding their predeliberation discussions of the evidence and expressions of opinion regarding the plaintiff's case. Specifically, the court found that the jurors followed the court's instructions not to decide the issues before hearing all of the evidence.[6] The court focused on the testimony of the jurors and the assertions they made during the hearing as to the *actual* impact the misconduct had on them. Additionally, the court found that any statements made by M stating his opinion, or that his mind was made up, were made before he sent the note to the court indicating his bias and before he assured the court that he would keep an open mind. On the basis of M's testimony at the hearing, the court concluded that M had "kept his mind open." The court specifically credited M's statement: "I kept looking for some sort of evidence . . . to show that . . . there was neglect, I was looking for it. I was waiting for it, and I never did see it, I—I didn't make up my mind, I really wanted to see, is there anything on the other side, and I never did see it." In its memorandum of decision, the court did not discuss testimony that C and L had expressed opinions about the case prior to deliberations. On the basis of the jurors' claims at the hearing regarding their adherence to the court's instructions and without consideration of the likely impact of the jurors' admitted misconduct on the fairness of the trial in light of the nature and quality of juror misconduct, the court concluded that the plaintiff had not met her burden of proving she was prejudiced by the misconduct.

---

[6] The court discredited the testimony of G and P due to the "circumstances under which their affidavits were procured and scripted."

In light of the evidence of the serious nature and quality of undisputed jury misconduct in this instance, the court's reliance on statements by the jurors that they kept their minds open despite the ongoing presubmission discussions was misplaced. The court's evaluation of the subjective assessment by jurors that they followed the court's instructions and, by implication were not swayed by the improper presubmission discussions, ignored the likely influence of the misconduct.[7] In other words, the court employed an incorrect legal analysis in determining whether the plaintiff was prejudiced by focusing its attention on the mental processes of the jurors and drawing conclusions from their testimony as to the *actual effect* of the misconduct, and not the *probable* effect of their misconduct as objectively judged by its nature and quality.

In support of its position that the court properly determined that the plaintiff was not prejudiced by juror misconduct, the defendant relies on *State* v. *Newsome*, 238 Conn. 588, 682 A.2d 972 (1996). Although our Supreme Court has held that statements of jurors regarding biases ought not be disregarded as "inevitably suspect"; id., 631;[8] *Newsome* is legally and factually

---

[7] In concluding that the plaintiff was not prejudiced by the juror misconduct, the court also relied on its finding that this was a "conscientious" jury in that it deliberated for a few hours and asked a few questions after the case was submitted to it for deliberations. Not only is this an impermissible subjective view of the mental processes of this jury, but this court has noted that "[t]he length of time that a jury deliberates has no bearing on nor does it directly correlate to the strength or correctness of its conclusions or the validity of its verdict. In fact, the length of time of the jury's deliberations is a double-edged sword. A short deliberation, rather than being indicative of a lack of diligence, may in fact attest to the strength of the [prevailing party's] case." *State* v. *Hernandez*, 28 Conn. App. 126, 136, 612 A.2d 88, cert. denied, 223 Conn. 920, 614 A.2d 828 (1992).

[8] It is noteworthy that this language in *Newsome* comes from *State* v. *Rodriguez*, 210 Conn. 315, 330, 554 A.2d 1080 (1989), which did not involve presubmission deliberations and, in fact, is a case in which all of the jurors testified that no misconduct had occurred.

distinguishable from the case at hand. In *Newsome,* certain jurors improperly discussed the credibility of one of the state's witnesses prior to deliberations. The trial court found that although the jurors had discussed the fact that a witness had told two different stories about the crime, they did not express any opinion as to which account, if either, was truthful or whether the defendant was guilty. Thus, the court concluded that "although improper, the remarks were limited in scope and did not result in any juror committing himself or herself to a position on the evidence, the primary danger associated with jurors' presubmission discussion of the evidence or issues in the case." Id. Additionally, the jurors' conversations about the credibility of a witness did not relate to a contested issue, as both the state and the defense had made it clear that the witness had changed his story. The Supreme Court therefore concluded that because the "comments relating to [the witness'] credibility were limited to recognition of the view, stressed by counsel for both the state and the defendant, that [the witness] had told two different stories about the crime; were few in number; were made or heard only by a small minority of the jurors and alternates; and, further, that there was no indication that the challenged comments either influenced the jurors' deliberations or prejudiced them against the defendant"; id., 632; the trial court properly concluded that the defendant was not prejudiced by the misconduct.

In contrast to the present case, in *Newsome,* although the jurors discussed the fact that the witness changed his story regarding the crime, they did not opine as to the truth of the witness' stories. And, as noted, the lack of credibility of the witness in *Newsome* was uncontested. Here, on the other hand, the presubmission discussions and expressions of opinions by jurors related to core, contested issues in the case. There was ample

evidence before the court that certain jurors formed and expressed opinions regarding the merits of the plaintiff's case. These comments were numerous and, unlike in *Newsome*, were not limited in scope to just one issue or one witness. Unlike the case at hand, the presubmission comments in *Newsome* were made or heard only by a small minority of the jurors. Here, several of the jurors testified that most of the jurors had made comments throughout the trial or engaged in the presubmission discussions.

Additionally, the court relied exclusively on the jurors' assurances that they remained unbiased and did not make up their minds until they had heard all of the evidence. In reaching its conclusion regarding prejudice, the court did not assess testimony that the jurors' discussions were ongoing throughout the entirety of the trial and that more than one juror openly expressed a position on the plaintiff's case prior to submission of the case to the jury. Our Supreme Court has explained the danger involved when a juror expresses an opinion on the evidence, stating that "the human mind is constituted so that what one himself publicly declares touching any controversy is much more potent in biasing his judgment and confirming his predilections than similar declarations which he may hear uttered by other persons. When most men commit themselves publicly to any fact, theory, or judgment they are too apt to stand by their own public declarations, in defiance of evidence. This pride of opinion and of consistency belongs to human nature." (Internal quotation marks omitted.) *State* v. *Washington*, supra, 182 Conn. 426.

Finally, although the Supreme Court in *Newsome* opined that it was not improper for the trial court to have permitted testimony from the jurors regarding the impact of their presubmission discussions regarding the credibility of a witness, the trial court in *Newsome*,

unlike the court in the present case, denied the defendant's motion to open on the basis of its findings regarding the nature and quality of jury misconduct. Thus, although *Newsome* includes the proposition that a court need not ignore what jurors may say about the effect of improper conduct on them, it does not change the fundamental requirement that the court make its ultimate determination on the basis of its *own* assessment of the likely effect of juror misconduct based on its nature and quality.

In sum, *Newsome* is distinguishable from the present case because the trial court in *Newsome* followed the proper analytical path in focusing on the nature and quality of the misconduct and the *probable* effect it had on the jurors, whereas the court in this case relied solely on the jurors' claims regarding the *actual* effect the ongoing predeliberation discussions had on them in determining that the plaintiff was not prejudiced by the misconduct. In light of the extraordinary circumstances of this case, in which more than one juror openly expressed his or her opinion regarding the plaintiff's case and most of the jurors commented on the credibility or reliability of the witnesses prior to submission of the case to them, the court abused its discretion by concluding that it was not probable that the misconduct prejudiced the plaintiff's case.

II

The defendant claims, as an alternate ground for affirmance, that the court improperly failed to preclude the testimony of the plaintiff's expert witness, Gerald Sokol, a physician, pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). Specifically, the defendant claims that Sokol's opinion was not supported by any scientifically reliable methodology. We disagree.

Prior to trial, the defendant filed a motion to preclude Sokol's testimony on the ground that his opinions were not properly founded in or based on any reliable medical, scientific or other specialized knowledge, or any recognized scientific methodology. The court held a *Porter* hearing at which Sokol testified that as a result of the defendant's failure to diagnose the plaintiff's cancer in August, 2000, her chance of recovery was diminished. Sokol testified that the most significant factor in determining survivability is the number of cancer positive lymph nodes or the volume of the tumor. He opined that if the plaintiff's cancer had been found in August, 2000, instead of June, 2001, the plaintiff would have had far fewer positive nodes and a greater than 50 percent chance of survival. Sokol based his opinion on the number of positive lymph nodes found in July, 2001, the rate of growth of the plaintiff's tumor and the fact that the number of positive nodes has a linear relation with the volume of cancerous tumors. In support of his opinion, Sokol cited several medical journal articles that he provided to the court.

The court denied the defendant's motion to preclude. In doing so, the court indicated that it considered Sokol's testimony, the written materials that he provided to the court and the affidavit of the defendant's expert witness. The court found that Sokol's opinions were reliable and were "based on scientific knowledge rooted in methods and procedures of science [including] articles in peer reviewed literature pertinent to his opinions." The court further found that there is "a general acceptance of the tumor mode metastasis staging, that is, tumor, size, node involvement and prognostication of the outcome. . . . [T]he relation between tumor size, lymph node status and outcome has been qualitatively known for many years. Numerous studies have shown the value of using tumor size and nodal status to estimate prognosis in breast cancer. . . . [The articles relied on by Sokol] also pertain to

a relationship between tumor size, be it primary or multifocal or centric, and the number or percentage of nodes involved . . . indicating a linear relationship between [the] diameter of [the] primary tumor and [the] percent [of] positive lymph nodes." In further support of its conclusion that Sokol's opinion was based on appropriate methodology, the court referred to a statement contained in the affidavit of the defendant's expert witness in which he, too, relied on peer reviewed literature in opining as to the plaintiff's chance of survival if she had commenced the recommended treatment in June, 2001. The court further found that Sokol's testimony was relevant because it related to the plaintiff and the facts of her case and her disease. The court stated that it based its conclusions on the principles and methodology underlying Sokol's opinions, not the substance of his conclusions, because the jury is entitled to give those conclusions whatever weight it deems appropriate.[9]

"It is well established that [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . Concerning expert testimony specifically, the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed." (Citation omitted; internal quotation marks omitted.) *Prentice* v. *Dalco Electric, Inc.*, 280 Conn. 336, 342, 907 A.2d 1204 (2006), cert. denied, 549 U.S. 1266, 127 S. Ct. 1494, 167 L. Ed. 2d 230 (2007). "Because a trial court's

[9] As our Supreme Court stated in *Porter*, "[a]s long as the expert's methodology is well founded, the nature of the expert's conclusion is generally irrelevant, even if it is controversial or unique. . . . [In other words] [o]nce the methodology underlying an expert conclusion has been sufficiently established, the mere fact that controversy, or even substantial controversy, surrounds that conclusion goes only to the weight, and not to the admissibility, of such testimony." (Citation omitted; internal quotation marks omitted.) *State* v. *Porter*, supra, 241 Conn. 83.

ruling under *Porter* involves the admissibility of evidence, we review that ruling on appeal for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 214, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006).

In *Porter*, our Supreme Court adopted the test for determining the admissibility of scientific evidence. "First . . . the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. . . . This requirement establishes a standard of evidentiary reliability . . . as, [i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity. . . . Second . . . the scientific evidence must fit the case in which it is presented. . . . In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract." (Internal quotation marks omitted.) *State* v. *John*, 282 Conn. 260, 270–71, 919 A.2d 452 (2007).

Here, the court properly engaged in the inquiry mandated by *Porter* and admitted Sokol's testimony. On the basis of our thorough review of the record, we cannot conclude that the court abused its discretion when it denied the defendant's motion to preclude.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.